**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Adams v. DeWine*, **Slip Opinion No. 2022-Ohio-89.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-89

ADAMS ET AL. *v.* DEWINE, GOVERNOR, ET AL.

LEAGUE OF WOMEN VOTERS OF OHIO ET AL. *v.* OHIO REDISTRICTING COMMISSION ET AL.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Adams v. DeWine*, Slip Opinion No. 2022-Ohio-89.]**

*Redistricting—Original actions under Ohio Constitution, Article XIX, Section 3(A)—General Assembly did not comply with Article XIX, Section 1(C)(3)(a) and (b) of the Ohio Constitution in passing the congressional-district plan—Plan invalid—General Assembly ordered to pass within 30 days a new congressional-district plan that complies in full with Article XIX of the Ohio Constitution and is not dictated by partisan considerations.*

(Nos. 2021-1428 and 2021-1449—Submitted December 28, 2021—Decided January 14, 2022.)

ORIGINAL ACTIONS filed pursuant to Ohio Constitution, Article XIX, Section 3(A).

_____

**DONNELLY, J.**

{¶ 1} In our representative democracy, the power rests at all times with the people. Their power is never more profound than when it is expressed through their vote at the ballot box. Those whom the people elect to represent them are given transitory authority to discharge their responsibilities under the Constitutions and laws of the United States and the state of Ohio, but the true power is expressed by the people when they exercise their right to vote on what Walt Whitman celebrated as "America's choosing day," when the heart of it is not in the chosen but in the act of choosing. Walt Whitman, *Election Day, November, 1884*, in *Leaves of Grass* 391 (1891-1892 Ed.).

{¶ 2} Gerrymandering is the antithetical perversion of representative democracy. It is an abuse of power—by whichever political party has control to draw geographic boundaries for elected state and congressional offices and engages in that practice—that strategically exaggerates the power of voters who tend to support the favored party while diminishing the power of voters who tend to support the disfavored party. Its singular allure is that it locks in the controlling party's political power while locking out any other party or executive office from serving as a check and balance to power. One avaricious proponent of congressional redistricting and gerrymandering declared redistricting "a great event," proclaiming gleefully: "Redistricting is like an election in reverse! Usually the voters get to pick the politicians. In redistricting, the politicians get to pick the voters!" Miles Parks, *Redistricting Guru's Hard Drives Could Mean Legal, Political Woes for GOP* (June 7, 2019), https://www.npr.org/2019/06/06/730260511/redistricting-gurus-hard-drives-could-mean-legal-political-woes-for-gop (accessed Jan. 3, 2022) [https://perma.cc/Q4WS-2VK2] (statements of Thomas Hofellor).

{¶ 3} Demanding change following Ohio's 2011 reapportionment of its state legislative and congressional districts, Ohio voters overwhelmingly voted to impose constraints on the government's ability to draw districts based on partisan

2

gerrymandering, amending Article XI of the Ohio Constitution in 2015 for the drawing of state legislative districts, *see* Ohio Secretary of State, *Statewide Issue History*, https://www.ohiosos.gov/elections/election-results-and-data/historical-election-comparisons/statewide-issue-history/ (accessed Jan. 3, 2022) [https://perma.cc/CK6W-2KUC], and adopting Article XIX of the Ohio Constitution in 2018 for the drawing of congressional districts, *see* Ohio Secretary of State, *2018 Official Election Results*, https://www.ohiosos.gov/elections/election-results-and-data/2018-official-elections-results/ (accessed Jan. 3, 2022) [https://perma.cc/RG5P-39FT] (follow "Summary-Level Official Results for 2018 Primary Election–Statewide Issues" hyperlink). The adoption of these amendments to the Ohio Constitution made it unequivocally clear that more of the same was not an option.

{¶ 4} Despite the adoption of Article XIX, the evidence in these cases makes clear beyond all doubt that the General Assembly did not heed the clarion call sent by Ohio voters to stop political gerrymandering. Conducting business as usual with no apparent concern for the reforms contemplated by Article XIX, the General Assembly enacted 2021 Sub.S.B. No. 258, which passed by a simple majority and was signed into law by Governor Mike DeWine on November 20, 2021. The bill resulted in districts in which undue political bias is—whether viewed through the lens of expert statistical analysis or by application of simple common sense—at least as if not more likely to favor Republican candidates than the 2011 reapportionment that impelled Ohio's constitutional reforms. The petitioners in the two cases before us specifically allege that the congressional-district plan violates Article XIX, Section 1(C)(3)(a) of the Ohio Constitution, which prohibits the General Assembly from adopting by a simple majority a congressional-district plan that "unduly favors or disfavors a political party or its incumbents," and Section 1(C)(3)(b), which prohibits the General Assembly from "unduly split[ting] governmental units."

{¶ 5} We hold that the congressional-district plan is invalid in its entirety because it unduly favors the Republican Party and disfavors the Democratic Party in violation of Article XIX, Section 1(C)(3)(a). We also hold that the plan unduly splits Hamilton, Cuyahoga, and Summit Counties in violation of Section 1(C)(3)(b). We order the General Assembly to adopt a new congressional-district plan that complies in full with Article XIX of the Ohio Constitution.

## I. BACKGROUND

### A. Overview of the congressional-redistricting process

{¶ 6} In 2018, the General Assembly passed a joint resolution to amend the Ohio Constitution and enact Article XIX, which would establish a process and standards for congressional redistricting. 2018 Sub.S.J.R. No. 5. The General Assembly previously had enacted congressional-district plans by bill, without any guidance from the Ohio Constitution. When the initiative was placed on the ballot in 2018, the ballot language informed voters that the proposed amendment would, among other things:

- Require the General Assembly or the Ohio Redistricting Commission to adopt new congressional districts by a bipartisan vote for the plan to be effective for the full 10-year period[; and]
- Require that if a plan is adopted by the General Assembly without significant bipartisan support, it cannot be effective for the entire 10-year period and must comply with explicit anti-gerrymandering requirements.

Ohio voters overwhelmingly voted in favor of adopting the amendment. *See* Ohio Secretary of State, *2018 Official Election Results*.

{¶ 7} In 2019—before Article XIX became effective—a panel of federal judges declared Ohio's 2011 congressional-district plan an unconstitutional partisan

4

gerrymandering, finding that it was designed to reliably elect 12 Republican representatives and 4 Democratic representatives as Ohio's 16-member delegation to the United States House of Representatives. *Ohio A. Philip Randolph Inst. v. Householder*, 373 F.Supp.3d 978, 994-995 (S.D.Ohio 2019). But later that year, the Supreme Court of the United States held that partisan-gerrymandering claims present political questions beyond the reach of federal courts, *Rucho v. Common Cause*, 588 U.S. __, __, 139 S.Ct. 2484, 2506-2507, 2014 L.Ed.2d 931 (2019), and vacated the judgment in *Ohio A. Philip Randolph Inst.*, *see Householder v. Ohio A. Philip Randolph Inst.*, __ U.S. __, 140 S.Ct. 101, 205 L.Ed.2d 1 (2019), and *Chabot v. Ohio A. Philip Randolph Inst.*, __ U.S. __, 140 S.Ct. 102, 205 L.Ed.2d 1 (2019).

*1. Article XIX, Section 1: A new process for congressional redistricting*

{¶ 8} Article XIX, Section 1 sets forth a potential three-step process for enacting or adopting a congressional-district plan. First, by September 30 of any year ending in the numeral one after the release of the federal decennial census, the General Assembly must pass a district plan in the form of a bill by a vote of at least three-fifths of the members of each house, including the affirmative vote of at least one-half of the members of each of the two largest political parties. Ohio Constitution, Article XIX, Section 1(A). If the General Assembly passes such a plan, the plan remains effective for ten years. *See id.*

{¶ 9} Second, if no district plan is passed by September 30, the Ohio Redistricting Commission must adopt a plan by October 31. *Id.* at Section 1(B). The plan must be approved by at least four of the seven members of the commission, including at least two members from each of the two largest political parties. *Id.* If the commission adopts a plan in this way, the plan remains effective for ten years. *Id.*

{¶ 10} Third, if the commission fails to adopt a plan by October 31, the General Assembly must pass a district plan in the form of a bill by November 30. *Id.* at Section 1(C)(1). If the General Assembly passes the plan by a vote of at least

three-fifths of each house, including at least one-third of the members of each of the two largest political parties, the plan remains effective for ten years. *Id.* at Section 1(C)(2). If the General Assembly passes the plan by only a simple majority in each house, the plan remains effective for four years. *Id.* at Section 1(C)(3).

{¶ 11} Of particular relevance in these cases, if the General Assembly passes a plan by a simple majority, Article XIX, Section 1(C)(3) provides that each of the following "shall apply":

> (a) The general assembly shall not pass a plan that unduly favors or disfavors a political party or its incumbents[;]
>
> (b) The general assembly shall not unduly split governmental units, giving preference to keeping whole, in the order named, counties, then townships and municipal corporations[; and]
>
> (c) * * * The General Assembly shall attempt to draw districts that are compact.[1]

In addition, the General Assembly must include in the plan "an explanation of the plan's compliance with" Section 1(C)(3)(a) through (c). *Id.* at Section 1(C)(3)(d).

### 2. *Article XIX, Sections 2 and 3: New district-drawing standards and this court's jurisdiction*

{¶ 12} Article XIX, Section 2 imposes various requirements on the entity drawing the districts, including rules relating to the shape of the districts and the extent to which counties, townships, and municipal corporations may be split

---

1. In contrast, if the General Assembly passes a ten-year plan by the affirmative vote of at least three-fifths of the members of each house of the General Assembly, including at least one-third of the members of the two largest political parties, "[e]very congressional district shall be compact." Ohio Constitution, Article XIX, Section 2(B)(2).

between districts. Article XIX, Section 3(A) provides that this court "shall have exclusive, original jurisdiction in all cases arising under" Article XIX.

### B. Factual background and procedural history

*1. No redistricting plan is adopted by September 30 or October 31*

**{¶ 13}** Based on the results of the 2020 census, Ohio was apportioned 15 congressional seats—one fewer than it was apportioned in 2011. Although the United States Census Bureau released Ohio's 2020 population data on August 12, 2021, the General Assembly did not pass a congressional-district plan by its initial September 30 deadline. On September 29, Senate Minority Leader Kenny Yuko and Senator Vernon Sykes introduced a proposed congressional-district plan on behalf of the Senate Democrats. *See* 2021 S.B. No. 237. But the record does not indicate that any other plans were proposed in September, and the General Assembly did not vote on any proposal during that period.

**{¶ 14}** Nor did the redistricting commission adopt a plan by its October 31 deadline. Senator Sykes, a cochair of the commission, sent the other cochair, respondent Speaker of the House Robert Cupp, multiple letters in which Senator Sykes essentially pleaded with House Speaker Cupp to schedule commission hearings and take up the task of congressional redistricting. In one of those letters, Senator Sykes noted that over 40 congressional-district plans had been submitted to the commission and that he and Senator Yuko had submitted their own proposed plan to the commission. But the record does not indicate that any other member of the commission proposed a plan. And the commission held only one meeting—on October 28. At the meeting, the commission heard public testimony from multiple individuals who had submitted proposed congressional-district plans to the commission, but it did not vote on any proposed plan.

*2. The General Assembly passes a redistricting plan by a simple majority*

**{¶ 15}** On November 3—only a few days after the redistricting commission's deadline for adopting a plan had expired—Senator Rob McColley introduced 2021

S.B. No. 258, a congressional-district plan drawn primarily by Ray DiRossi, the finance director for the Ohio Senate. DiRossi was deeply involved in Ohio's 2001 and 2011 redistricting processes. Notably, he served as one of the Republicans' "principal on-the-ground map drawers" during the 2011 congressional-redistricting process, *Ohio A. Philip Randolph Inst.*, 373 F.Supp.3d at 995, 1019—a process that a federal court described as "rife with procedural irregularities and suspect behavior on the part of the map drawers," *id.* at 1099.

{¶ 16} Also on November 3, Representative Scott Oelslager introduced in the House a different proposed congressional-district plan drawn primarily by Blake Springhetti, the finance director for the Republican House majority. Over the next week, House and Senate committees held hearings on those proposed plans and other plans introduced by Democratic members of the House and Senate. On November 10 and 12, the Joint Committee on Congressional Redistricting held public hearings on all the proposed plans.

{¶ 17} On November 16, Senator McColley introduced 2021 Sub.S.B. No. 258 ("S.B. 258"), a revised district plan formulated by respondents President of the Senate Matthew Huffman and House Speaker Cupp, and Senator McColley, DiRossi, and Springhetti. During a Senate committee hearing, Senator McColley said that compared to the other proposed plans, S.B. 258 was the most competitive, split the fewest counties, kept more of Ohio's largest cities whole, and created compact districts. He also stated that the S.B. 258 plan contained seven competitive districts.

{¶ 18} During the present litigation, DiRossi explained how he, Senate President Huffman, and Senator McColley concluded that the S.B. 258 plan contained seven competitive districts. The determination involved two decisions: (1) which prior election results to use for predicting the partisan leanings of the proposed new districts under the plan and (2) how to define a "competitive" district.

{¶ 19} Regarding the first decision, DiRossi selected the election results from the statewide *federal* elections over the last ten years. Six elections fell into that

category: the 2012, 2016, and 2020 presidential elections and the 2012, 2016, and 2018 United States Senate elections. Some of the parties in this case refer to this "dataset" of election results as "FEDEA." Based on the FEDEA dataset, DiRossi estimated—using a computer program—how a candidate from each political party might perform in the proposed new districts. Regarding the second decision, Senate President Huffman and Senator McColley defined a "competitive" election as one in which a candidate is expected to obtain 50 percent of the vote, plus or minus 4 percent, resulting in up to an 8-point spread between the winning and losing candidates. They determined that the S.B. 258 plan contained seven competitive districts because—based on the FEDEA dataset—Republican candidates would likely receive between 46 and 54 percent of the vote in seven districts.

{¶ 20} DiRossi, however, also analyzed the proposed district plan using other election datasets, and under those analyses, the plan had fewer competitive districts. For example, the computer program that DiRossi used also showed the partisan leaning of the proposed districts based on election results from statewide federal *and* state elections from 2016 to 2020. Under that dataset, the S.B. 258 plan had only five competitive districts.

{¶ 21} On November 16—the same day that Senator McColley introduced the final version of S.B. 258 in committee—the full Senate voted along party lines to adopt it as the congressional-district plan. Two days later, the House passed S.B. 258 without any support by its Democratic Party members. During the House and Senate floor debates, Democratic members argued that S.B. 258 was less fair than the 2011 congressional map and that the enactment process did not comply with Article XIX. On November 20, Governor DeWine signed the bill into law.

{¶ 22} As required by Article XIX, Section 1(C)(3)(d), the final bill included an explanation of how it complied with Section 1(C)(3)(a) through (c). The explanation stated:

(A) The congressional district plan does not unduly favor or disfavor a political party or its incumbents. The plan contains six Republican-leaning districts, two Democratic-leaning districts, and seven competitive districts. The number of competitive districts in the plan significantly exceeds the number of competitive districts contained in the congressional district plan described in the version of section 3521.01 of the Revised Code that was in effect immediately before the effective date of this section. Two incumbents expected to seek office again, both Republican, are paired in one district in the plan described in sections 3521.01 to 3521.0115 of the Revised Code, as enacted by this act. No other incumbent, either Republican or Democratic, expected to seek office again, is paired with another incumbent in a congressional district in this plan.

(B) The congressional district plan does not unduly split governmental units and gives preference to keeping whole, in the order named, counties, then townships and municipal corporations. The plan splits only twelve counties and only fourteen townships and municipal corporations. The congressional district plan described in the version of section 3521.01 of the Revised Code that was in effect immediately before the effective date of this section split twenty-three counties and over thirty townships and municipal corporations.

*3. Petitioners[2] file two actions in this court*

{¶ 23} Within ten days of the governor's signing the bill, two lawsuits were filed in this court challenging the congressional-district plan. First, in case No. 2021-1428, 12 individual voters[3] filed a complaint alleging that the plan violates Article XIX, Section 1(C)(3)(a) and (b) of the Ohio Constitution. Second, in case No. 2021-1449, the League of Women Voters of Ohio, the A. Philip Randolph Institute of Ohio, and eight individual voters[4] filed a similar complaint alleging that the district plan violates Section 1(C)(3)(a) and (b).

{¶ 24} In either one or both of the lawsuits, the petitioners named as respondents the redistricting commission, the seven individual members of the commission, Governor DeWine in his official capacity as governor and a member of the redistricting commission, Secretary of State Frank LaRose in his official capacity as secretary of state and a member of the redistricting commission, House Speaker Cupp in his official capacity as speaker of the House and a member of the redistricting commission, and Senate President Huffman in his official capacity as president of the Senate and a member of the redistricting commission. We dismissed as respondents the commission, the seven members of the commission in their official capacities, and Governor DeWine in his official capacity as governor. __ Ohio St.3d __, 2021-Ohio-4237, __ N.E.3d __; __ Ohio St.3d __, 2021-Ohio-4267, __ N.E.3d __. The cases have proceeded against Secretary LaRose in his official capacity as secretary of state, House Speaker Cupp in his official capacity as speaker of the

---

2. Although the parties refer to themselves as relators and respondents, these actions were not brought in the name of the state. *See* R.C. 2731.04; S.Ct.Prac.R. 12.03 (the party filing an action in mandamus, prohibition, procedendo, or quo warranto is referred to as a "relator"). Therefore, this opinion refers to the parties bringing the actions as "petitioners."

3. The 12 voters in case No. 2021-1428 are Regina C. Adams, Bria Bennett, Kathleen M. Brinkman, Martha Clark, Susanne L. Dyke, Carrie Kubicki, Dana Miller, Meryl Neiman, Holly Oyster, Constance Rubin, Solveig Spjeldnes, and Everett Totty.

4. The eight voters in case No. 2021-1449 are Bette Evanshine, Janice Patterson, Barbara Brothers, John Fitzpatrick, Janet Underwood, Stephanie White, Renee Ruchotzke, and Tiffany Rumbalski.

House, and Senate President Huffman in his official capacity as president of the Senate.

{¶ 25} Pursuant to our scheduling orders, the parties in these cases conducted discovery and submitted evidence and merit briefs. As evidence, the parties filed six expert reports, numerous deposition transcripts, multiple affidavits, and voluminous documents. This court held oral argument in both cases on December 28, 2021.

## II. ANALYSIS

### A. The burden and standard of proof

{¶ 26} Districting and apportionment are primarily legislative tasks that are subject to judicial review for constitutional compliance. *See Ely v. Klahr*, 403 U.S. 108, 114, 91 S.Ct. 1803, 29 L.Ed.2d 352 (1971), citing *Reynolds v. Sims*, 377 U.S. 533, 586, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *see also* Ohio Constitution, Article XIX, Section 3. As with any other legislation, the plan is "entitled to a strong presumption of constitutionality," *State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, ¶ 20.

{¶ 27} When a legislative act is challenged on its face, we require proof beyond a reasonable doubt that no set of circumstances exists under which the statute would be valid, while an as-applied challenge requires clear and convincing evidence of the statute's constitutional defect. *See Ohio Renal Assn. v. Kidney Dialysis Patient Protection Amendment Commt.*, 154 Ohio St.3d 86, 2018-Ohio-3220, 111 N.E.3d 1139, ¶ 26; *Wymsylo v. Bartec, Inc.*, 132 Ohio St.3d 167, 2012-Ohio-2187, 970 N.E.2d 898, ¶ 20. We may not override the General Assembly's judgment on policy questions that are committed exclusively to the legislative branch. *See Ohio Congress of Parents & Teachers* at ¶ 20.

{¶ 28} But that does not mean that we must defer to the General Assembly on questions of law. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177, 2 L.Ed. 60 (1803). Our function here is to determine whether the act " 'transcends the limits

of legislative power.' " *Ohio Congress of Parents & Teachers* at ¶ 20, quoting *State ex rel. Bishop v. Mt. Orab Village School Dist. Bd. of Edn.*, 139 Ohio St. 427, 438, 40 N.E.2d 913 (1942).

{¶ 29} While petitioners' challenge here perhaps more closely resembles an as-applied challenge to S.B. 258's application to the particular set of facts existing at the time of this reapportionment as opposed to a frontal assault on the act's validity under any given set of facts, we will nevertheless assume without deciding that petitioners' challenge here is subject to the highest standard of proof; evidence that proves unconstitutionality beyond a reasonable doubt will necessarily satisfy the lesser standard of clear and convincing evidence.

## B. Section 1(C)(3)(a)

### 1. Section 1(C)(3)(a) establishes a judicially manageable standard

{¶ 30} Article XIX, Section 1(C)(3)(a) prohibits the General Assembly from passing a congressional-district plan "that unduly favors or disfavors a political party or its incumbents." Senate President Huffman and House Speaker Cupp argue that this provision does not establish a judicially manageable standard, because it does not indicate how much favoring or disfavoring of a political party is *too much*. They contend that in the absence of a clear legal standard, the General Assembly alone has the discretion to determine whether a plan *unduly* favors a political party.

{¶ 31} Senate President Huffman and House Speaker Cupp rely on *Rucho*, 588 U.S. __, 139 S.Ct. 2484, 204 L.Ed.2d 931, in which the Supreme Court of the United States held that partisan-gerrymandering claims arising under the federal Constitution present political questions that are not justiciable in federal courts. The *Rucho* court explained that to avoid " 'assuming political, not legal, responsibility,' " federal courts must "act only in accord with especially clear standards." *Id*. at __, 139 S.Ct. at 2498, quoting *Vieth v. Jubelirer*, 541 U.S. 267, 307, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (Kennedy, J., concurring). The court held that "[a]ny standard for resolving such claims must be grounded in a 'limited and precise rationale' and

be 'clear, manageable, and politically neutral.' " *Id.*, quoting *Vieth* at 306-308 (Kennedy, J., concurring).

{¶ 32} Two main factors underlie the *Rucho* holding: (1) the federal Constitution does not include a "plausible grant of authority" to federal courts to review partisan-gerrymandering claims, and (2) there are no "legal standards to limit and direct" the decision-making of federal judges in such claims. *Id.* at __, 139 S.Ct. at 2507. The first factor is not present in these cases. The people of Ohio have prohibited the General Assembly from passing, by a simple majority, a congressional-district plan that unduly favors or disfavors political parties or their incumbents. Ohio Constitution, Article XIX, Section 1(C)(3)(a). And the people have granted this court "exclusive, original jurisdiction in all cases arising under" Article XIX. *Id.* at Section 3(A). That is more than a plausible grant of authority.

{¶ 33} Moreover, the fact that the Ohio Constitution expressly forbids partisan gerrymandering and grants authority to this court lessens the degree to which a manageable standard is necessary:

> [C]ourts might be justified in accepting a modest degree of unmanageability to enforce a constitutional command which (like the Fourteenth Amendment obligation to refrain from racial discrimination) is clear; whereas they are not justified in inferring a judicially enforceable constitutional obligation (the obligation not to apply *too much* partisanship in districting) which is both dubious and severely unmanageable.

(Emphasis sic.) *Vieth* at 286 (plurality opinion). Indeed, in *Rucho*, the court suggested that state constitutional and statutory provisions similar to Section 1(C)(3)(a) provide standards and guidance that state courts can apply. *Rucho* at __, 139 S.Ct. at 2507-2508, citing, inter alia, Florida Constitution, Article III, Section

14

20(a) ("No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent") and Del.Code Ann., Title xxix, Section 804 (providing that no state legislative district shall "be created so as to unduly favor any person or political party"). Chief Justice John Roberts, writing for the majority, noted: "We do not understand how the dissent can maintain that a provision saying that no districting plan 'shall be drawn with the intent to favor or disfavor a political party' provides little guidance on the question." *Id.* at __, 139 S.Ct. at 2507.

{¶ 34} Contrary to what Senate President Huffman and House Speaker Cupp argue, Ohio voters intended that the anti-gerrymandering requirements in Article XIX, Section 1(C)(3) have teeth. Section 1(C)(3)(a) articulates a standard that is "grounded in a 'limited and precise rationale' and [that is] 'clear, manageable, and politically neutral,' " *Rucho*, 588 U.S. at __, 139 S.Ct. at 2498, 2014 L.Ed.2d 931, quoting *Vieth*, 541 U.S. at 306-308, 124 S.Ct. 1769, 158 L.Ed.2d 546 (Kennedy, J., concurring).

{¶ 35} Article XIX, Section 1(C)(3)(a) prohibits the General Assembly from passing, by a simple majority, a congressional-district plan that "unduly favors or disfavors a political party or its incumbents." In interpreting this language, we apply the rules that govern the interpretation of statutes. *See Toledo City School Dist. Bd. of Edn. v. State Bd. of Edn.*, 146 Ohio St.3d 356, 2016-Ohio-2806, 56 N.E.3d 950, ¶ 16. That is, we must begin with the language of the provision itself, *id.*, and consider "how the words and phrases would be understood by the voters in their normal and ordinary usage," *Centerville v. Knab*, 162 Ohio St.3d 623, 2020-Ohio-5219, 166 N.E.3d 1167, ¶ 22, citing *District of Columbia v. Heller*, 554 U.S. 570, 576-577, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). In other words, "[i]n construing constitutional text that was ratified by direct vote, we consider how the language would have been understood by the voters who adopted the amendment." *Centerville* at ¶ 22.

{¶ 36} Article XIX does not define "unduly." But "[i]n determining the 'common and ordinary meaning' of words, courts may look to dictionaries." *Athens v. McClain*, 163 Ohio St.3d 61, 2020-Ohio-5146, 168 N.E.3d 411, ¶ 30. The dictionary definition of "undue" is "[e]xcessive or unwarranted." *Black's Law Dictionary* 1838 (11th Ed.2019); *see also Webster's Third New International Dictionary* 2492 (defining "unduly" as "in an undue manner, *esp* : EXCESSIVELY" and defining "undue" as "exceeding or violating propriety or fitness: EXCESSIVE, IMMODERATE, UNWARRANTED" [italics and small caps sic]). This, of course, raises questions: In excess of what? Or, unwarranted by what?

{¶ 37} Senate President Huffman and House Speaker Cupp assert that petitioners' benchmark is proportionality. And they note that Article XIX lacks any explicit proportionality standard like the one for General Assembly–district plans set forth in Article XI, Section 6(B).[5] But Senate President Huffman and House Speaker Cupp mischaracterize petitioners' argument. Although petitioners look to partisan proportionality as one metric in some aspects of their analysis, their claims do not rest on a demand for proportionality. Rather, petitioners assert that the General Assembly passed a plan with a partisan advantage that "is *unwarranted by valid considerations*, namely, the redistricting criteria set forth in Article XIX." (Emphasis added.)

{¶ 38} Those redistricting criteria are mainly set forth in Article XIX, Section 2. They include requirements that a congressional-district plan comply with all applicable state and federal constitutional provisions and with federal law protecting racial-minority voting rights and that a plan be composed of contiguous territory, with a single, nonintersecting boundary line. They also include guidelines on

---

5. Article XI, Section 6(B) of the Ohio Constitution requires the Ohio Redistricting Commission to attempt to draw a General Assembly–district plan in which "[t]he statewide proportion of districts whose voters, based on statewide state and federal partisan general election results during the last ten years, favor each political party shall correspond closely to the statewide preferences of the voters of Ohio."

splitting or not splitting municipalities of various sizes and locations; limitations on the number of counties that may be split not more than once and the number that may be split not more than twice; a requirement that in districts containing only part of a particular county, the portion of the county within the district be contiguous with the boundaries of the county; a requirement that no two districts may share portions of more than one county, unless the county's population exceeds 400,000; and a requirement that the General Assembly attempt to include at least one whole county in each district. Ohio Constitution, Article XIX, Section 2(B)(1) through (8). Also, Section 1(C)(3)(c) requires the General Assembly to attempt to draw districts that are compact.

{¶ 39} "Where provisions of the Constitution address the same subject matter, they must be read *in pari materia* and harmonized if possible." *Toledo Edison Co. v. Bryan*, 90 Ohio St.3d 288, 292, 737 N.E.2d 529 (2000). That is, when possible, we must construe provisions to give each provision reasonable and operable effect. *State ex rel. Toledo v. Lucas Cty. Bd. of Elections*, 95 Ohio St.3d 73, 78, 765 N.E.2d 854 (2002).

{¶ 40} Reading Article XIX, Sections 1 and 2 together, we conclude that Section 1(C)(3)(a) prohibits the General Assembly from passing by a simple majority a plan that favors or disfavors a political party or its incumbents to a degree that is in excess of, or unwarranted by, the application of Section 2's and Section 1(C)(3)(c)'s specific line-drawing requirements to Ohio's natural political geography. In other words, Section 1(C)(3)(a) does not prohibit a plan from favoring or disfavoring a political party or its incumbents to the degree that inherently results from the application of neutral criteria, but it does bar plans that embody partisan favoritism or disfavoritism in excess of that degree—i.e., favoritism not warranted by legitimate, neutral criteria.

*2. The enacted plan unduly favors the Republican Party and unduly disfavors the Democratic Party*

{¶ 41} The evidence overwhelmingly shows that the enacted plan favors the Republican Party and disfavors the Democratic Party to a degree far exceeding what is warranted by Article XIX's line-drawing requirements and Ohio's political geography.

### a. The enacted plan's expected performance

{¶ 42} Although Ohio has not yet held any congressional elections under the enacted plan, the parties agree that, in general, voting history in prior elections can predict future voting patterns. As a starting point, we examine how the two major political parties are expected to perform under the enacted plan. The parties have submitted the reports of several experts to aid in this analysis.

{¶ 43} To start, Senate President Huffman and House Speaker Cupp argue that the enacted plan does not allocate each of Ohio's 15 congressional districts to one party or another but instead maximizes the number of competitive districts. They rely on the report of their only expert, Dr. Michael Barber, who is an associate professor of political science at Brigham Young University with significant experience in evaluating political and elections-related data. Dr. Barber explained that in Ohio, Democratic voters are heavily clustered in urban areas and Republican voters are more evenly distributed throughout the state. This political geography, he concluded, constrains map drawers. Indeed, using the FEDEA dataset, he found that the enacted plan is "quite similar" to the plans proposed by the House and Senate Democrats: they all include six districts that are solidly Republican and two districts that are solidly Democratic.

{¶ 44} Citing Dr. Barber's report, Senate President Huffman and House Speaker Cupp assert that 8 out of Ohio's 15 congressional districts must be drawn as "safe" districts for either Democrats or Republicans. Given that asserted reality, they decided to draw the remaining seven districts as competitive ones. Dr. Barber

confirmed that under the FEDEA dataset, the enacted plan includes seven competitive districts. He also evaluated the enacted plan's competitiveness by determining whether a Democratic and Republican candidate for statewide federal office had won a majority of the two-party vote share in the district from 2012 to 2020. He again found seven competitive districts under the enacted plan.

{¶ 45} But "competitiveness" is not a prescribed standard under Article XIX of the Ohio Constitution. That term does not appear within Article XIX, and rules of statutory construction forbid us from adding to the text of Article XIX. While supposed district competitiveness was offered here as a post hoc rationalization for the mapped districts in the enacted plan, Article XIX itself does not require it and does not provide any calculable measure for it.

{¶ 46} Beyond that, petitioners submitted multiple expert reports showing that the enacted plan is not nearly as competitive as Senate President Huffman and House Speaker Cupp claim that it is. Dr. Jonathan Rodden is a professor of political science at Stanford University with expertise in the analysis of fine-grained geospatial data sets, including election results. He concluded that *state* statewide election results have more reliably tracked how Ohioans have voted in congressional elections. Dr. Rodden therefore concluded that by relying on only the FEDEA dataset, respondents exclude the most relevant data to predict the partisan outcomes of the enacted plan. Dr. Rodden claimed that by using a more comprehensive dataset and considering an incumbency advantage, the enacted plan has only two or three competitive districts.

{¶ 47} Dr. Christopher Warshaw is an associate professor of political science at George Washington University and has written about elections and partisan gerrymandering. He noted that the FEDEA dataset excluded "the Republican wave year" of 2014 and heavily weighted the two federal elections in 2012, which was a "high-water mark for Democrats in Ohio." Dr. Warshaw found that the plan has three competitive districts, although Republican candidates are favored in each. Dr.

Rodden and Dr. Warshaw both found that Republicans are likely to win 80 percent of the congressional seats (12 out of 15) under the enacted plan, even though Republicans have received about 53 percent of the vote in recent statewide elections.

{¶ 48} Petitioners also submitted the analysis of other experts who compared the enacted plan to thousands of computer-simulated plans that comply with Article XIX's neutral districting criteria. Dr. Kosuke Imai is a professor in the government and statistics departments at Harvard University and specializes in the development of statistical methods for social-science research. He used the FEDEA dataset in finding that Republicans likely will win 11 of 15 seats under the enacted plan.[6] He generated 5,000 Article XIX–compliant simulated plans, again using the FEDEA dataset. Those simulated plans did not split any counties that the enacted plan does not split, contained more compact districts and had fewer county splits than the enacted plan, and were—just like the enacted plan—applied to Ohio's particular political geography.

{¶ 49} Dr. Imai found that Republicans would win 8 seats in 80 percent of those plans and 9 seats in the other 20 percent of those plans. None of Dr. Imai's simulated plans awarded Republicans 11 or more seats. Dr. Imai therefore found— using the same dataset used by DiRossi—that Republicans are expected to win 2.8 more seats under the enacted plan than under the simulated plans. The enacted plan, Dr. Imai concluded, is "a clear statistical outlier," which means there is the presence of "systemic partisan bias." Dr. Imai concluded that the probability of the enacted plan's partisan favoritism resulting from the application of neutral criteria is essentially zero.

---

6. Dr. Imai does not believe that the FEDEA dataset will accurately predict the partisan leaning of the districts in the enacted plan. He used that dataset only because DiRossi and others used it for predicting the partisan outcome of the enacted plan. Dr. Imai avers that the FEDEA dataset, if anything, *undercounts* the number of likely Republican seats.

{¶ 50} Dr. Jowei Chen is an associate professor of political science at the University of Michigan and has published academic papers on legislative redistricting and political geography. He used the results of all statewide elections from 2016 to 2020 to generate 1,000 Article XIX–compliant simulated plans to assess whether the partisan outcome of the enacted plan is within the normal range of the simulated district plans. Dr. Chen found that Republicans will likely win 12 of 15 congressional seats under the enacted plan. In contrast, only 1.3 percent of the simulated plans created 12 Republican-favoring districts. Dr. Chen concluded that the enacted plan is a "statistical outlier" and that the plan's "extreme" partisan bias cannot be attributable to Ohio's political geography, which he accounted for in his simulations.[7]

{¶ 51} We conclude that the body of petitioners' various expert evidence significantly outweighs the evidence offered by respondents as to both sufficiency and credibility, compelling beyond any reasonable doubt the conclusion that the enacted plan excessively and unwarrantedly favors the Republican Party and disfavors the Democratic Party.

### b. Additional comparisons focusing on particular counties

{¶ 52} Petitioners also submitted compelling evidence showing how the enacted plan's treatment of certain urban counties unduly favors the Republican Party and disfavors the Democratic Party.

{¶ 53} Dr. Imai examined districts in Hamilton, Franklin, and Cuyahoga Counties and concluded that "the enacted plan packs a disproportionately large number of Democratic voters into some districts while cracking Democratic voters

---

7. The dissenting justices assert that they are unable to evaluate the simulated maps because they were not part of the record. However, Dr. Imai and Dr. Chen submitted expert affidavits extensively describing their methodology, data sources, and conclusions based on the 6,000 simulated plans reviewed, and they also submitted as exhibits examples and data referenced in the affidavits. We find that this evidence in the record sufficiently supports the conclusions cited herein.

in other districts to create Republican-leaning seats."[8]  For each of those counties, he compared the Republican vote share of each precinct's assigned district in the enacted plan with the average of the Republican vote shares for each district that precinct was assigned to in each of his 5,000 simulated plans.  For example, Precinct 061031BEZ, in Cincinnati, is in District 1 in the enacted plan, a district with an expected Republican vote share of 51.53 percent.  The average Republican vote share of the districts to which that precinct is assigned (across Dr. Imai's 5,000 simulated plans) is 44.85 percent—6.68 percentage points lower than the enacted plan.  This shows that the enacted plan assigned that precinct to a more Republican-leaning district than the average simulated plan.

{¶ 54} Dr. Imai states that performing this exercise for all the precincts in Hamilton County reveals that "the enacted plan cracks Democratic voters, leading to solely Republican districts."  The enacted plan does this by splitting Hamilton County twice (placing county territory in three districts), whereas the simulated plans split it only once.  According to Dr. Imai, the additional split in the enacted plan results in Hamilton County having no Democratic seats, "whereas the simulated plans are expected to yield a Democratic seat.  So in Hamilton County alone, cracking of Democratic voters nets Republicans an entire seat."

{¶ 55} Again, Dr. Imai's analysis is particularly useful because he used the FEDEA dataset—i.e., the dataset preferred by Senate President Huffman and House Speaker Cupp.  But petitioners presented evidence from several other experts who also concluded, using different datasets, that the enacted plan's treatment of urban counties disfavors the Democratic Party to an excessive degree that is unwarranted by Article XIX and the area's political geography.

---

8.  A "packed" district is one in which a party's supporters are highly concentrated, so they win that district by a large margin, "wasting" many votes that would improve their chances in other districts; a "cracked" district is one in which a party's supporters are divided among multiple districts, so that they fall short of a majority in each.  *See Rucho*, 588 U.S. at __, 139 S.Ct. at 2492, 204 L.Ed.2d 931.

{¶ 56} Dr. Rodden compared the enacted plan with alternative plans proposed by the Democratic caucuses and the Ohio Citizens Redistricting Committee. He explained that the enacted plan carves up the Black community in Cincinnati, splitting it into three districts and submerging it among predominantly white, exurban, and rural voters. He concludes:

> Under any method of counting splits, the Enacted Plan's approach involves at least two splits of Hamilton County—a line running north-south on the east side of the county and another one that carves out the northern suburbs. These maneuvers are clearly not necessary for any reason other than partisan advantage. Each of the alternative plans keeps metro Cincinnati together in a compact district remaining within the county, avoids splitting the Black community, and splits the county only once.

{¶ 57} Dr. Chen compared the enacted plan to his 1,000 simulated plans and found that more than 80 percent of those plans placed Cincinnati in a district with a 45 percent Republican vote share and that the vast majority of those plans kept Cincinnati in a compact district solely within Hamilton County, whereas the enacted plan placed it in a noncompact district connected to Warren County by a thin strip of territory—thereby combining the heavily Democratic city with a large rural area, resulting in a district with a Republican vote share Dr. Chen calculates at 51.6 percent. Dr. Chen concluded that the enacted plan included a noncompact district containing Cincinnati that was drawn to be favorable to Republicans. This resulted in a district that was more favorable to Republicans than the Cincinnati district in over 97 percent of his simulated plans.

{¶ 58} Petitioners' experts similarly concluded that the districts encompassing Franklin County were drawn to confer partisan advantages to the

Republican Party. Dr. Imai found that the enacted plan packs Franklin County Democratic voters into a "single, heavily Democratic" district in order to create additional Republican-leaning districts, "leaving much of the city of Columbus in a Republican district stretching most of the way to Cincinnati." As a result, much of Franklin County—including parts of Columbus—belongs to a safe Republican district. By contrast, Dr. Imai's 5,000 simulated plans showed that the entirety of Franklin and Delaware Counties and a portion of Fairfield County would be expected to belong to a Democratic-leaning district. Dr. Imai concluded that by confining Democratic voters to a single district, the enacted plan packs voters in a way that yields an additional seat for Republicans as compared to Dr. Imai's simulated plans.

{¶ 59} Similarly, Dr. Rodden opined that the enacted plan packs Democrats into a single, very concentrated Columbus district, then "reaches around the city to extract its outer reaches and suburbs, connecting them with far-flung rural communities to the southwest—an arrangement that prevents the emergence of a second Democratic district by removing Democratic Columbus-area neighborhoods from their context and submerging them in rural Republican areas." The following figure from Dr. Rodden's report illustrates his point:



Figure 14: Partisanship and Enacted Districts, Columbus and Surroundings

Alternative plans, Dr. Rodden notes, split Franklin County with a line that runs from east to west to create a compact southern district and a relatively compact northern district that crosses over into Delaware County, which would keep Columbus's northern suburbs together.

{¶ 60} Regarding Columbus and Franklin County, Dr. Chen opined:

[T]he Enacted Plan's two Columbus-area districts are clear partisan outliers: CD-3, which contains most of Columbus' population, is more heavily Democratic than all 1,000 of the simulated plans' districts with the most Columbus population. Consequently, the Enacted Plan's CD-15, which contains the second-most of Columbus'

population, is more heavily Republican than 98% of the simulated plans' districts with the second-most Columbus population.

And according to Dr. Chen, Districts 3 and 15 are also "less geographically compact" than nearly every simulated plan's districts containing the most and second most Columbus residents—which is not a result "one could reasonably expect from a districting process that follows the districting requirements of the Ohio Constitution." For these reasons, we conclude that the enacted plan divided Franklin County into noncompact districts to confer a partisan advantage on the party drawing the plan.

{¶ 61} Finally, Dr. Imai's examination of Cuyahoga and Summit Counties yielded a similar conclusion: "While under the simulated plans, the suburbs of Cleveland are expected to belong to either Democratic districts or highly competitive districts, the enacted plan packs urban Democratic voters, leaving the remainder of Cuyahoga County and nearby areas in Republican districts." This results in territory that would be expected to be in Democratic-leaning districts based on the simulated plans being divided to support the population needed for three Republican districts and one competitive district in the enacted plan. Dr. Rodden and Dr. Chen again concur. Dr. Rodden noted that the enacted plan splits Cuyahoga County into three districts and contains a district that would be noncontiguous except for a narrow corridor that is one precinct wide, and it also carves up Democratic-leaning areas around Akron. Dr. Chen concluded that the enacted plan engages in unnatural packing around Cleveland "to an extent that is not explained by Cuyahoga County's political geography."

{¶ 62} This expert analysis demonstrates that in each of Ohio's three largest metropolitan areas, the enacted plan contains districts that are not shaped according to Article XIX's neutral districting criteria or Ohio's political geography; instead, the inescapable conclusion is that they are the product of an effort to pack and crack

Democratic voters, which results in more safe Republican districts or competitive districts favoring the Republican Party's candidates. Not only are such oddly shaped districts not required by the criteria set forth in Article XIX, but they are in tension, if not in conflict, with Section 1(C)(3)(c)'s exhortation that the General Assembly "shall attempt to draw districts that are compact." Ohio Constitution, Article XIX, Section 1(C)(3)(c). And they split communities of interest, such as the Black community in Hamilton County. *See Rucho*, 588 U.S. at __, 139 S.Ct. at 2500, 204 L.Ed.2d 931 ("keeping communities of interest together" is a traditional redistricting criterion).

### c. Other measures of partisan bias

{¶ 63} Petitioners' experts also found that the enacted plan unduly favors the Republican Party when considered under other analytical methods created by political scientists to measure partisanship in redistricting:

- The "efficiency gap," which measures the difference between the parties' respective "wasted votes" (i.e., the number of votes above the 50 percent plus 1 that a party needs to win an election), divided by the total number of votes cast.

- The "mean-median gap," which measures the difference between a party's vote share in the median district and its average vote share across all districts. If a party wins more votes in the median district than in the average district, then the mean-median gap indicates that the plan gives that party an advantage in the translation of votes to legislative seats.

- "Declination," which measures the asymmetry in the distribution of votes across districts. For example, if the Democratic Party's average vote share in districts it won is significantly higher than the Republican Party's average vote share in the districts it won, the Democratic Party's districts are considered to be packed.

- "Partisan symmetry," which measures whether each party would receive the same share of seats under the plan assuming they had identical shares of votes. For example, if the Democratic Party would win 51 percent of the seats if it received 55 percent of the votes, but the Republican Party would win 66 percent of the seats if it received 55 percent of the votes, then the partisan-symmetry metric indicates that the map favors the Republican Party.

{¶ 64} Dr. Warshaw analyzed the enacted plan under each of these metrics using three different election datasets. He then compared the results to congressional elections across the nation from 1972 to 2020. He concluded that regardless of the approach used, "the enacted map has an extreme level of bias in favor of the Republican [P]arty." For example, using the election results from all statewide elections from 2012 to 2020, Dr. Warshaw found that the enacted plan is more extremely biased than 70 percent of previous plans and "more pro-Republican" than 85 percent of previous plans.

{¶ 65} Dr. Imai similarly considered the four partisan-bias metrics when comparing the enacted plan to his 5,000 simulated plans. He concluded that the enacted plan is a "clear outlier" favoring the Republican Party and is more biased than any of the 5,000 simulated plans under all four metrics. Dr. Rodden found that the enacted plan's efficiency gap—the difference in the number of "wasted votes" between Democratic and Republican candidates—was higher than the efficiency gaps in almost every other comparable state. Dr. Chen found that the enacted plan's efficiency gap is larger than 99.5 percent of his simulated plans.

{¶ 66} These various expert analyses further confirm beyond any reasonable doubt that the enacted plan excessively and unnecessarily favors the Republican Party and unduly disfavors the Democratic Party.

### d. *Senate President Huffman and House Speaker Cupp did not effectively rebut petitioners' evidence*

{¶ 67} Senate President Huffman and House Speaker Cupp argue that the analyses of Dr. Rodden and Dr. Chen are flawed because they did not use the FEDEA dataset to predict election outcomes. Although Dr. Rodden and Dr. Chen used different datasets, they applied the *same* datasets to the enacted plan that they applied to the simulated or alternative plans and then compared partisan outcomes. Their analyses therefore are relevant to the question whether the enacted plan favors a party in a way unwarranted by the neutral factors in Article XIX. Moreover, Dr. Imai did use the FEDEA dataset, and Senate President Huffman and House Speaker Cupp's brief does not even mention Dr. Imai.

{¶ 68} Senate President Huffman and House Speaker Cupp also argue that we have previously "discounted the usefulness" of analyzing an enacted plan using alternative plans that were not presented to the General Assembly prior to its adoption of the enacted plan, citing *Wilson v. Kasich*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, ¶ 43-46. But *Wilson* does not prohibit consideration of alternative plans; it merely cites the fact that the two alternative plans presented by the expert witness in that case had not been before the apportionment board as one reason (among many others, including flawed methodology) that we did not find the evidence sufficient to carry the burden of proof in that case. *Id.* In *Wilson*, this court determined at ¶ 2, 14-16 that Article XI's provisions, as then written, did not mandate political neutrality in an apportionment plan—in contrast to other states that prohibited drawing plans that favored or disfavored a political party—and thereafter rejected the relators' claims that Sections 7 and 11 of former Article XI had been violated. Here, by contrast, the simulated plans go to the very question we held was not at issue in *Wilson*. The simulated plans are relevant evidence that the enacted plan unduly favors the Republican Party, which is proscribed by the very provision we are considering—Article XIX, Section 1(C)(3)(a).

**{¶ 69}** Senate President Huffman and House Speaker Cupp's expert, Dr. Barber, points out potential flaws in the plans submitted by the Democratic caucuses, but that evidence does not go to the relevant question: whether the plan *passed by the General Assembly* unduly favors or disfavors a political party. Based on the evidence discussed previously, we conclude that it does.

**{¶ 70}** Contrary to the insistence by the dissent[9] that our decision today is based on some amorphous notion of "proportional representation," Article XIX contains no such standard. And to be clear, our judgment here rests not on "proportional representation" but rather on the Constitution's explicit text stating that a plan cannot unduly favor or disfavor a political party or unduly split governmental units for partisan advantage.

**{¶ 71}** Finally, as noted above, Senate President Huffman and House Speaker Cupp claim that the General Assembly prioritized crafting *competitive* districts in areas where doing so was possible. Article XIX does not require, prohibit, or even mention competitive districts. But it does require the General Assembly to attempt to draw districts that are compact. Ohio Constitution, Article XIX, Section 1(C)(3)(c). And most importantly, Article XIX prohibits undue partisan favoritism. *Id.* at Section 1(C)(3)(a). The above evidence, particularly Dr. Imai's conclusion that the enacted plan will result in, on average, 2.8 more Republican seats than are warranted, shows that the General Assembly's decision to shift what could have been—under a neutral application of Article XIX—Democratic-leaning areas into competitive districts, i.e., districts that give the Republican Party's candidates a better chance of winning than they would otherwise have had in a more compactly drawn district, resulted in a plan that unduly favors the Republican Party and unduly disfavors the Democratic Party.

---

9. The dissent has chosen to use the unprecedented format of a "joint dissent." This authorship label has never been used by this court. Its use now, without explanation by the dissent, is unusual and inexplicable.

*3. Respondents' Fourteenth Amendment warning is unfounded*

{¶ 72} As an additional argument for rejecting petitioners' claims that the plan unduly favors the Republican Party at the expense of the Democratic Party, Senate President Huffman and House Speaker Cupp warn that imposing a proportionality requirement would itself be reverse partisan gerrymandering. They argue that remedying respondents' violations would run afoul of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

{¶ 73} Senate President Huffman and House Speaker Cupp's argument that the court's invalidation of the congressional-district plan in favor of strict proportionality is an "absurd" idea that would discriminate against Republican voters and minor-party voters mischaracterizes the issue in this case. For again, petitioners do not argue for strict proportionality. Petitioners' claims are based on Article XIX of the Ohio Constitution, which forbids the General Assembly from passing by a simple majority a plan that unduly favors or disfavors a political party. Because Section 1(C)(3)(a) does not require a strictly proportional plan, the General Assembly need not necessarily enact one.

{¶ 74} Moreover, Senate President Huffman and House Speaker Cupp's argument is at odds with *Rucho*'s holding that partisan-gerrymandering claims under the Fourteenth Amendment are not justiciable in federal courts. *See Rucho*, 588 U.S. at __, 139 S.Ct. at 2506-2507, 204 L.Ed.2d 931. Senate President Huffman and House Speaker Cupp offer no reason why, after *Rucho*, any court would entertain a claim alleging partisan gerrymandering in violation of the Fourteenth Amendment.

## C. Section 1(C)(3)(b)

{¶ 75} Article XIX, Section 1(C)(3)(b) provides: "The General Assembly shall not unduly split governmental units, giving preference to keeping whole, in the order named, counties, then townships and municipal corporations." Petitioners argue that the enacted plan violates Section 1(C)(3)(b) because it unduly splits urban

counties in ways that are not required by Ohio's political geography, equal population, or any other redistricting requirements in Article XIX. Rather, petitioners contend that the splits were drawn purely for partisan advantage.

{¶ 76} Senate President Huffman and House Speaker Cupp argue that this court may "easily reject[]" this argument because it is undisputed that the plan "divides fewer governmental units than the 2011 Congressional Plan as well as the two Democratic proposed congressional plans." They also note that the plan complies with the limits on splitting counties, townships, and municipal corporations, as provided in Article XIX, Section 2(B). For example, they note that under Section 2(B)(5), 23 counties may be split into different congressional districts but that the enacted plan splits only 12 counties.

{¶ 77} For the reasons explained below, we conclude that the enacted plan unduly splits three counties in violation of Section 1(C)(3)(b). Those splits result in noncompact districts that cannot be explained by any neutral factor and serve no purpose other than to confer partisan advantage to the political party that drew the plan.

1. *Permissive splitting under Section 2(B) does not authorize partisan splitting*

{¶ 78} Senate President Huffman and House Speaker Cupp's arguments can be easily rejected. First, the fact that the enacted plan divides fewer governmental units than the 2011 congressional-district plan or the plans proposed by the House and Senate Democrats is immaterial. Showing that other plans would split more governmental units does not validate the enacted plan. Moreover, the 2011 congressional-district plan is an improper comparator because Article XIX was not part of the Ohio Constitution when the General Assembly passed that plan and no other provision of the Ohio Constitution addressed the undue splitting of governmental units with regard to congressional redistricting prior to its enactment. *See* 2018 Sub.S.J.R. No. 5.

{¶ 79} Second, the enacted plan's compliance with Article XIX, Section 2(B) does not foreclose a claim that the plan unduly splits governmental units under Section 1(C)(3)(b). No part of the Constitution "should be treated as superfluous unless that is manifestly required," and this court should avoid any construction that makes a provision "meaningless or inoperative." *State ex rel. Myers v. Spencer Twp. Rural School Dist. Bd. of Edn.*, 95 Ohio St. 367, 373, 116 N.E. 516 (1917). If compliance with the county-, township-, and municipal-corporation-splitting rules in Section 2(B) were sufficient for any plan enacted under Article XIX, there would be no need for the Constitution to contain a separate provision precluding the General Assembly from unduly splitting governmental units. To give meaning to Section 1(C)(3)(b), the provision must be interpreted to contemplate that a congressional-district plan could unduly split governmental units even though the splits are not otherwise prohibited under Section 2(B).

{¶ 80} For example, a district plan may violate Article XIX, Section 1(C)(3)(b) by splitting governmental units as a means to confer an undue partisan advantage—even if the district plan otherwise complies with Section 2(B). As discussed above, the ordinary meaning of "undue" is "[e]xcessive or unwarranted." *Black's* at 1838; *see also Webster's* at 2492. A split may be unwarranted if it confers an undue partisan advantage on the political party that drew the map and if it cannot otherwise be explained by neutral redistricting criteria.

{¶ 81} If there were any doubt as to that interpretation of Section 1(C)(3)(b), the structure of Article XIX and the purpose of the amendment also lead to that conclusion. In construing constitutional text that was ratified by direct vote, "our inquiry must often include more than a mere analysis of the words found in the amendment." *Centerville*, 162 Ohio St.3d 623, 2020-Ohio-5219, 166 N.E.3d 1167, at ¶ 22. If the meaning of constitutional text is unclear, we "may review the history of the amendment and the circumstances surrounding its adoption, the reason and

33

necessity of the amendment, the goal the amendment seeks to achieve, and the remedy it seeks to provide to assist the court in its analysis." *Id.*

{¶ 82} Here, the General Assembly is prevented from unduly splitting governmental units *only* when the district plan is passed by a simple majority—that is, when the political party in power enacted the plan without sufficient bipartisan support. When the amendment was placed on the 2018 ballot, the language specifically informed voters that if the General Assembly adopted a plan without significant bipartisan support, the plan "must comply with explicit anti-gerrymandering requirements." *See* Statewide Issue Ballot Language for the Primary Election Occurring May 8, 2018, available at https://www.ohiosos.gov/globalassets/ballotboard/2018/2018_primary_issuesrepo rt.pdf#page=1 (accessed Jan. 4, 2022) [https://perma.cc/7E9V-Q3B]. *Black's Law Dictionary* defines "gerrymandering" as "[t]he practice of dividing a geographical area into electoral districts, often of highly irregular shape, to give one political party an unfair advantage by diluting the opposition's voting strength." *Id.* at 830.

{¶ 83} Therefore, the splitting of a governmental unit may be "undue" if it is excessive or unwarranted. A split may be unwarranted if it cannot be explained by any neutral redistricting criteria but instead confers a partisan advantage on the party that drew the map—regardless of whether the plan complies with Article XIX, Section 2(B). In other words, permissive splitting under Section 2(B) does not authorize partisan splitting.

### 2. *The district plan unduly splits Hamilton County*

{¶ 84} The enacted plan splits Hamilton County into three districts for no apparent reason other than to confer an undue partisan advantage on the Republican Party. In the 2020 presidential election, the Democratic candidate received 58 percent of the vote in Hamilton County and the Republican candidate received 42 percent of the vote. But under the enacted plan, two of Hamilton County's new districts (Districts 2 and 8) would be safe Republican districts and the third new

district (District 1) would lean slightly Republican—even using the FEDEA dataset. None of those districts are entirely within Hamilton County.

{¶ 85} Dr. Imai found that Hamilton County's "Democratic areas are cracked to yield three Republican-leaning districts, despite a significant concentration of Democratic voters in and around Cincinnati." The result of the "manipulations and additional splits of Hamilton County," he concluded, "nets Republicans an entire seat," while the simulated plans are expected to yield a Democratic seat.

{¶ 86} Dr. Rodden similarly found that any attempt to "minimize splits and keep Cincinnati-area communities together would produce a majority-Democratic district." The enacted plan, he concluded, carves out Hamilton County's northern Black population from its surroundings neighborhoods and combines it with a mostly rural district that ends 85 miles to the north, extracts Cincinnati from its immediate inner-ring suburbs and combines the city proper with Warren County via a narrow corridor, and extracts Cincinnati's eastern suburbs and combines them with "extremely rural" counties to the east. The following map from Dr. Rodden's report illustrates his point:



Figure 9: Partisanship and the Enacted Plan's Districts, Hamilton County and Surroundings

Alternative plans submitted to the General Assembly, Dr. Rodden noted, kept metro Cincinnati together in a compact district *within* Hamilton County, avoided splitting the Black community, and split the county only once. Dr. Rodden concluded that the splits in Hamilton County "are clearly not necessary for any reason other than partisan advantage."

{¶ 87} Dr. Chen concluded that splitting Hamilton County into three districts is "statistically anomalous" and that only 1.3 percent of his simulated plans similarly split the county into three districts. He further found that one Cincinnati district in the enacted plan—District 1—has a higher Republican vote share than 98 percent of the computer-simulated Cincinnati districts. According to Dr. Chen,

the enacted plan achieves this "unnaturally high" Republican-vote share by "splitting Hamilton County into three districts and combining the Cincinnati portion of Hamilton County with Warren County"; the result is a "very non-compact shape[d]" District 1, with a compactness score that is much lower than the Cincinnati-based districts in virtually all the computer-simulated districts. The enacted plan, Dr. Chen concluded, creates "an extreme partisan outcome" in District 1 "by splitting Hamilton County excessively and sacrificing geographic compactness in this district."

{¶ 88} In their brief, Senate President Huffman and House Speaker Cupp do not adequately explain why the enacted plan splits Hamilton County into three districts. Based on this record, we find that the two splits in Hamilton County were excessive and unwarranted. The evidence overwhelmingly shows that the effect of those splits was to confer significant partisan advantage on the party that drew the districts.

### 3. *The district plan unduly splits Summit and Cuyahoga Counties*

{¶ 89} The evidence also demonstrates that the enacted plan splits Summit and Cuyahoga Counties to confer partisan advantages on the Republican Party.

{¶ 90} Dr. Rodden concluded that the enacted plan splits Summit County by cutting Akron off from its eastern Democratic-leaning suburbs, placing those suburbs in a "long, narrow north-south corridor that is, in one spot, less than one mile wide" and connecting those areas with highly Republican rural areas up to 70 miles away. Dr. Rodden further noted that rather than combining Akron with its own suburbs, the enacted plan combines the city with Medina County in District 13 and "the most Republican outer exurbs of Cleveland." Alternative plans, he noted, mostly kept Summit County together. Dr. Rodden concluded that District 13 "appears to have been crafted as part of an effort to make sure there is only one very Democratic district in Northeast Ohio." What would have otherwise been a comfortable

Democratic, Akron-based district, he concludes, is instead a "toss up." The following illustration from Dr. Rodden's report demonstrates his points:



Figure 19: Partisanship and the Boundaries of the Enacted Plan, Northeast Ohio

{¶ 91} As it does with Hamilton County, the enacted plan splits Cuyahoga County into three districts—although Dr. Imai found that only 8 of his 5,000 simulated plans split two counties twice. One of those Cuyahoga County districts—District 14—includes a narrow corridor jutting into the county that, according to Dr. Rodden, is "in one spot, the width of one census block, with no road connecting" the two portions of the district. The result, according to Dr. Rodden, is that District 14 extracts large numbers of Democrats in suburban Cuyahoga County and places them in a district that is far more Republican.

{¶ 92} Dr. Imai concluded that the enacted plan overly packs Democratic voters into District 11—the district that includes Cleveland—and that the

surrounding districts were drawn to "crack the remaining Democratic voters outside of Cleveland and in the cities of Lorain and Akron." As a result, in northeast Ohio, the enacted plan creates three Republican-leaning districts and one competitive district, even though Dr. Imai's simulated plans generally show that the areas south and west of Cleveland would otherwise belong to a competitive or Democratic-leaning district. Dr. Chen similarly found that the Cleveland-based district was "less geographically compact than is reasonable for a Cleveland-based district" and instead appears "to have been drawn in order to create an extreme packing of Democratic voters that would not have naturally emerged from drawing a more compact Cleveland-based district."

{¶ 93} Senate President Huffman and House Speaker Cupp do not explain the basis for the splits in Summit or Cuyahoga Counties, nor do they attempt to explain the irregular shapes of the districts resulting from those splits. Under these circumstances, we conclude that the evidence shows that the enacted plan splits Summit and Cuyahoga Counties in ways that cannot be explained by any neutral criteria and instead confers a partisan advantage on the political party that drew the map.

### D. Systemic defects require the passage of a new plan that complies with Article XIX

{¶ 94} Article XIX, Section 3(B)(1) authorizes this court to determine that a congressional-district plan, or any congressional district or group of congressional districts, is invalid. It further provides that a corrective plan "shall remedy any legal defects in the previous plan identified by the court but shall include no changes to the previous plan other than those made in order to remedy those defects." *Id.*

{¶ 95} Article XIX, Section 3(B)(1) thus recognizes that in some circumstances, congressional plans that contain isolated defects may be subject to remediation by simply correcting the defects in the affected district or districts. But when a congressional-district plan contains systemic flaws such that constitutional

defects in the drawing of some district boundaries have a consequential effect on the district boundaries of other contiguous districts, such a plan is incapable of being remediated with the surgical precision necessary to correct only isolated districts while leaving the rest of the plan intact.

{¶ 96} In this case, the partisan gerrymandering used to generate the 2021 congressional-district plan, through undue party favoritism and/or undue governmental-unit splits, extends from one end of the state to the other. This plan defies correction on a simple district-by-district basis, if only as a consequence of the equal-population requirement prescribed by Article XIX, Section 2 and governing law. We therefore see no recourse but to invalidate the entire congressional-district plan.

{¶ 97} Article XIX, Section 3(B)(1) and (2) describe what happens next. Section 3(B)(1) provides that if any congressional-district plan is determined to be invalid by an unappealed final court order, the general assembly "shall pass" a congressional-district plan that complies with the Constitution. Section 3(B)(1) mandates both the timing and substance of any plan so passed. The plan shall be passed "not later than the thirtieth day after the last day on which an appeal of the court order could have been filed or, if the order is not appealable, the thirtieth day after the day on which the order is issued." *Id.* And the plan "shall remedy any legal defects in the previous plan identified by the court but shall include no changes to the previous plan other than those made in order to remedy those defects." *Id.*

{¶ 98} If the new congressional-district plan is not passed as Section 3(B)(1) describes, "the Ohio redistricting commission shall be reconstituted and reconvene and shall adopt a congressional district plan" in accordance with the Constitution. Article XIX, Section 3(B)(2). Again, this provision mandates both the timing and substance of the commission's actions. "The commission shall adopt that plan not later than the thirtieth day after the deadline described in division

(B)(1) of this section," and such plan "shall remedy any legal defects in the previous plan identified by the court but shall include no other changes to the previous plan other than those made in order to remedy those defects." Article XIX, Section 3(B)(2).

{¶ 99} By the plain language of Article XIX, Section 3(B), both the General Assembly and the reconstituted commission, should that be necessary, are mandated to draw a map that comports with the *directives of this opinion*.

### III. Conclusion

{¶ 100} When the dealer stacks the deck in advance, the house usually wins. That perhaps explains how a party that generally musters no more than 55 percent of the statewide popular vote is positioned to reliably win anywhere from 75 percent to 80 percent of the seats in the Ohio congressional delegation. By any rational measure, that skewed result just does not add up.

{¶ 101} The incontrovertible evidence in these cases establishes that the plan passed by the General Assembly fails to honor the constitutional process set out in Article XIX to reapportion Ohio's congressional districts. The General Assembly produced a plan that is infused with undue partisan bias and that is incomprehensibly more extremely biased than the 2011 plan that it replaced. This is not what Ohio voters wanted or expected when they approved Article XIX as a means to end partisan gerrymandering in Ohio for good. The time has now come for the General Assembly to faithfully discharge the constitutional responsibilities imposed by Article XIX and by oath of office.

{¶ 102} We hold that the General Assembly did not comply with Article XIX, Sections 1(C)(3)(a) and (b) of the Ohio Constitution in passing the congressional-district plan. We therefore declare the plan invalid and we order the General Assembly to pass a new congressional-district plan, as Article XIX, Section 3(B)(1) requires, that complies in full with Article XIX of the Ohio Constitution and is not dictated by partisan considerations.

Relief granted.

STEWART and BRUNNER, JJ., concur.

O'CONNOR, C.J., concurs, with an opinion joined by BRUNNER, J.

KENNEDY, FISCHER, and DEWINE, JJ., dissent, with an opinion.

———————————

**O'CONNOR, C.J., concurring.**

{¶ 103} I fully concur in the majority opinion. I write separately to emphasize the following point from the reply brief of petitioners in case No. 2021-1449: "[Petitioners] have never advocated that strict proportionality is required by Article XIX, Section 1(C)(3)(a). Indeed, it is not. But it goes too far in the other direction to suggest that in considering whether a plan is unduly partisan, the Supreme Court should simply ignore a gross departure from proportionality."

{¶ 104} The dissenting opinion's dismissive characterization of all the metrics used by petitioners' experts as simply being measures of "proportional representation" is sleight of hand. No magician's trick can hide what the evidence overwhelmingly demonstrates: the map statistically presents such a partisan advantage that it unduly favors the Republican Party.

{¶ 105} The "competitiveness" standard that respondents offer—a standard absent from the constitutional language—is another illusion. It asks that voters be satisfied by a "coin toss" without acknowledging the significant partisan advantage created across the state.

{¶ 106} For these reasons, I am not persuaded that the dissenting opinion offers a framework supported by the language of Article XIX of the Ohio Constitution or reflective of the evidence presented.

BRUNNER, J., concurs in the foregoing opinion.

———————————

**KENNEDY, FISCHER, and DEWINE, JJ., dissenting.**

{¶ 107} The majority today declares the congressional-district plan enacted by the legislature to be unconstitutional on the basis that it "unduly" favors a political party and "unduly" splits governmental units. It does so without presenting any workable standard about what it means to unduly favor a political party or divide a county.

{¶ 108} To the extent that one can find a guiding legal principle in what the majority does, it is that results under a district-based election system should roughly equate to what would happen under a system of proportional representation. But, of course, this country has never adopted a system of proportional representation, and nothing in Article XIX, Ohio's congressional-redistricting amendment, imposes one as a standard against which a legislative-redistricting plan must be measured. In stark contrast to Article XI, which establishes the standards for adopting a General Assembly-district plan, Article XIX does not require a congressional-district plan to even *attempt* to provide proportionately representative districts. *See* Article XI, Section 6(B), Ohio Constitution.

{¶ 109} Equally suspect is the majority's conclusion that the map unduly divides counties. Its analysis addresses only four of Ohio's 88 counties and wholly disregards the divisions of townships and municipalities. Moreover, Article XIX, Section 2(B)(5) expressly authorizes the congressional-district plan to split 18 counties one time and five counties two times. The plan not only complies with that provision, it also splits counties the bare mathematical minimum number of times: 14. It is impossible to draw a map with equally populated districts that contains fewer county splits and still meets the other criteria of the amendment. So what the majority is essentially saying is: we don't like the legislature's choices of counties to divide; it should have divided different ones. But that's a matter of policy preference—it has nothing to do with the law.

{¶ 110} No doubt, there are those who will be quite happy about the policy choices that the majority makes today. But no one should lose sight of the fact that what the majority does today is make policy, not apply the law. While none of us question that the majority sincerely believes that what it is crafting constitutes good policy, we have grave concerns about the majority's untethered-by-law eagerness to wrest from the political branches of our government the authority that rightly belongs to them. "The document that the Court releases is in the form of a judicial opinion," *Bostock v. Clayton Cty.*, __ U.S. __, __, 140 S.Ct. 1731, __, 207 L.Ed.2d 218 (2020) (Alito, J., dissenting), but the majority exercises political "will," not legal "judgment," *see* Alexander Hamilton, The Federalist No. 78.

{¶ 111} We believe that our authority is limited by the text of Article XIX and the constitutional restraints on the judicial power. Because the majority strays well beyond both, we respectfully dissent.[10]

## I. BACKGROUND

### A. The congressional-redistricting process

{¶ 112} In February 2018, the General Assembly enacted legislation to place on the ballot an amendment to the Ohio Constitution providing a new process for drawing congressional districts. The people of Ohio ratified the amendment in May 2018 with an effective date of January 1, 2021.

{¶ 113} Article XIX is designed to incentivize the political branches to reach bipartisan compromise on redistricting plans. It does this by providing that a plan that garners bipartisan, supermajority support lasts ten years while a plan passed by only a simple majority lasts four years. Article XIX, Sections 1(A), 1(C)(2), and 1(C)(3), Ohio Constitution. The amendment places primary

---

10. The majority says the joint authorship of a dissent is "unusual and inexplicable." Majority opinion at ¶ 70, fn. 9. It's not. *See, e.g.*, *Natl. Fedn. of Indep. Business v. Dept. of Labor, Occupational Safety & Health Administration*, __ U.S. __, __ S.Ct. __, __ L.Ed.2d __, Nos. 21A244 and 21A247, Slip Opinion, 2022 WL 120952, *8 (Jan. 13, 2022) (joint dissent of Breyer, Sotomayor, and Kagan, JJ.).

responsibility for congressional redistricting on the General Assembly.  *See* Section 1(A).  Section 1(A) requires the General Assembly to pass a congressional-district plan by the affirmative vote of three-fifths of the members of each house in the legislature, including the affirmative vote of at least one-half of the members of each of the two largest political parties.  If the plan is enacted by the required vote, it remains effective until the next year ending in the numeral one, i.e., ten years.  *Id.*

{¶ 114} If the General Assembly fails to enact a plan by the requisite vote in September of a redistricting year, then the redistricting commission established in Article XI must adopt a congressional-district plan by a majority vote including at least two members of the commission who represent each of the two largest political parties.  Section 1(B).  If that happens, the plan remains in effect for ten years.  *Id.*

{¶ 115} If the commission fails to agree on a plan by October 31, then the General Assembly *must* pass a congressional-district plan in the form of a bill not later than November 30.  Section 1(C)(1).  The plan is effective for ten years if it is passed by a three-fifths vote in each house, including an affirmative vote of at least one-third of the members of each of the two largest political parties.  Section 1(C)(2).

{¶ 116} Should the legislature fail to reach bipartisan consensus, Article XIX authorizes the General Assembly to pass a congressional-district plan by a simple majority vote of both houses.  Section 1(C)(3).  The penalty is that the plan lasts just four years.  *See* Section 1(C)(3)(e).  Such a plan must not "unduly favor[ ] or disfavor[ ] a political party or its incumbents," Section 1(C)(3)(a), or "unduly split governmental units," Section 1(C)(3)(b).

{¶ 117} The process repeats itself once the four-year plan expires.  Article XIX, Section 1(D), (E), and (F).  Further, when a congressional-district plan ceases to be effective, "the district boundaries described in that plan shall continue in

operation for the purpose of holding elections until a new congressional district plan takes effect." Section 1(J).

{¶ 118} Article XIX, Section 2 provides additional requirements for a congressional-district plan. All plans must include single-member districts divided by population according to the congressional ratio of representation. Section 2(A)(1) and (2). The ratio is the population of Ohio (11,799,448 according to the 2020 federal decennial census) divided by the number of House seats apportioned to this state (15), which equals 786,629 or 786,630 people per district. Section 2(A)(2). Section 2 further states that the plan "shall comply with all applicable provisions of the constitutions of Ohio and the United States and of federal law," Section 2(B)(1), that "[e]very congressional district shall be composed of contiguous territory," Section 2(B)(3), and that "the boundary of each district shall be a single nonintersecting continuous line," *id.* Ten-year plans must contain compact districts, Section 2(B)(2), but a four-year plan requires only an attempt to make districts compact, Section 1(C)(3)(c).

{¶ 119} Section 2 of Article XIX also includes requirements for dividing counties, townships, and municipal corporations. When the county has a municipality or township with a population that exceeds the size of a congressional district, the authority drawing the districts "shall attempt to include a significant portion of that municipal corporation or township in a single district and may include in that district other [governmental units] that are located in that county and whose residents have similar interests as the residents of the municipal corporation or township." Section 2(B)(4)(a). When the population of a municipality or township falls between 100,000 and the size of a congressional district, the city or township "shall not be split," unless the county contains two or more such governmental units, in which case only the most populous "shall not be split." Section 2(B)(4)(b).

46

{¶ 120} "The authority drawing the districts may determine which counties may be split." Section 2(B)(5). However, "sixty-five counties shall be contained entirely within a district, eighteen counties may be split not more than once, and five counties may be split not more than twice." *Id.* Further, "[n]o two congressional districts shall share portions of the territory of more than one county, except for a county whose population exceeds four hundred thousand," Section 2(B)(7), and "[t]he authority drawing the districts shall attempt to include at least one whole county in each congressional district," unless compliance would violate federal law or the district is entirely within one county, Section 2(B)(8).

{¶ 121} Article XIX, Section 3(A) vests this court with "exclusive, original jurisdiction in all cases arising under this article." If a court invalidates a congressional-district plan, a congressional district, or group of districts, then the General Assembly must pass a new district plan that remedies the legal defects the court identified in the previous plan. Section 3(B). However, if the General Assembly fails to enact a new plan within a 30-day period, the Ohio Redistricting Commission is reconstituted and must adopt a compliant congressional-district plan within 30 days. Section 3(B) and (C). Once the General Assembly or the redistricting commission produces a new plan, it is to be used until the next time for redistricting. *Id.*

**B. The legislature enacts a redistricting plan that purports to maximize the number of competitive districts**

{¶ 122} Based on the most recent census, Ohio is allotted 15 seats in the U.S. House of Representatives, one fewer than in the previous census cycle. The census data arrived late and in unconsumable format, *see Ohio v. Raimondo*, 848 Fed.Appx. 187, 188 (6th Cir.2021), and the General Assembly failed to meet the September 30 deadline to pass with bipartisan support a congressional-district plan good for ten years, *see* Article XIX, Section 1(A). The redistricting commission

then had the month of October to enact a bipartisan redistricting plan but was unable to do so. Section 1(B).

{¶ 123} This left the General Assembly the month of November to enact a plan "in the form of a bill." Section 1(C)(1). After attempts to reach bipartisan consensus in the legislature failed, both houses passed a plan with simple-majority support. The bill was signed into law by the governor soon thereafter. *See* R.C. 3521.01 et seq. Because the plan was enacted by only a simple majority, the plan is to remain in effect for four years. Section 1(C)(3)(e).

{¶ 124} The General Assembly included in the legislation "an explanation of the plan's compliance with" Section 1(C)(3). Section 1(C)(3)(d). The following constitute its legislative findings: "The plan contains six Republican-leaning districts, two Democratic-leaning districts, and seven competitive districts"; only one district pairs incumbents, and they are members of the Republican party; "[t]he plan splits only twelve counties and only fourteen townships and municipal corporations"; and "visual inspection of the congressional district plan demonstrates that it draws districts that are compact." 2021 Sub.S.B. No. 258, Section 3, 733-734, available at https://search-prod.lis.state.oh.us/solarapi/v1/general_assembly_134/bills/sb258/EN/05/sb258_05_EN?format=pdf (accessed Jan. 12, 2022) [https://perma.cc/DF75-WC9K]. The General Assembly reports that on each score, this plan improves upon the congressional-district plan enacted in 2011. The governor added his approval:

> SB 258 makes the most progress to produce a fair, compact, and competitive map. The SB 258 map has fewer county splits and city splits than these recent proposals and the current congressional map. The SB 258 map keeps Lucas and Stark counties, as well as the Mahoning Valley, whole within single congressional districts for the first time in decades, and also keeps the cities of Akron, Canton,

Cincinnati, Cleveland, Dayton, and Toledo all whole within the same congressional map for the first time since the 1840s. With seven competitive congressional districts in the SB 258 map, this map significantly increases the number of competitive districts versus the current map.

Governor of Ohio News Releases, *Governor DeWine Signs Senate Bill 258* (Nov. 20, 2021), https://governor.ohio.gov/wps/portal/gov/governor/media/news-and-media/governor-dewine-signs-senate-bill-258-11222021 (accessed Jan. 12, 2022) [https://perma.cc/9JLS-X2W6].

**{¶ 125}** Here is the plan:



{¶ 126} Start with the basics. Each of the 15 districts are virtually equipopulous, containing either 786,629 or 786,630 people. The plan splits 12 counties, down from 23 in the 2011 plan. Two counties—Hamilton and Cuyahoga—are split twice. Lucas and Stark counties are kept whole for the first time in decades. The plan splits 14 townships and municipalities, down from 35 in the 2011 plan. Of Ohio's cities not naturally split by county lines, 98 of the largest 101 are unsplit. Columbus accounts for one split because the state and federal Constitutions require it. *See* Sections 2(B)(1) (incorporating the one-person, one-vote requirement) and 2(B)(4)(a); *see also Reynolds v. Simms*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (same).

{¶ 127} The seven competitive districts are District 1, District 6, District 9, District 10, District 13, District 14, and District 15. Those districts respectively encompass greater Cincinnati, Ohio's eastern corridor, Toledo and surrounding counties, greater Dayton, greater Akron, northeast Ohio, and central Ohio between Cincinnati and Columbus. District 6, notably, was adjusted to keep the entire Mahoning Valley (all of Mahoning, Trumbull, and Columbiana counties) in a single district.

{¶ 128} By any measure, several of the districts are hypercompetitive. In the Cincinnati-area District 1, for example, statewide federal-election data from 2012 through 2020 ("FEDEA") show a district with a 51.5 percent Republican advantage; yet in the most recent election, the Democratic presidential candidate won the district. The Toledo-area District 9, in contrast, shows only a 47.7 percent Republican average, yet the Republican presidential candidate carried the district in the most recent election. The Dayton-area District 10 has a 52.2 percent Republican federal average and gave the Republican presidential candidate 51.8 percent of the vote in the last election. The Akron-area District 13 may be the most competitive of all, manifesting a 48.6 percent Republican average and giving the

Democratic presidential candidate a razor-thin 50.4 percent majority in the last presidential election.

{¶ 129} Each of the seven competitive districts, whether it leans left or right, is more competitive than it was in the 2011 plan. That leaves as noncompetitive the eight districts encompassing Cleveland, Columbus, Canton, and Ohio's rural regions. More than 46 percent of Ohioans live in competitive districts where candidate strength and voter turnout will dictate results; the rest are overwhelmingly likely to live in districts where their party has a decided advantage.

{¶ 130} Two groups of petitioners filed complaints in this court asserting that the enacted plan violates Article XIX of the Ohio Constitution. Petitioners assert the same two causes of action: first, the plan "unduly favors or disfavors a political party or its incumbents" in contravention of Section 1(C)(3)(a); second, the plan "unduly split[s] governmental units," contravening Section 1(C)(3)(b). The primary thrust of their claims is that under the plan, Democratic candidates will fail to win what they consider to be a fair number of seats in Ohio and the plan thus "unduly" favors the Republican party. They also claim that the plan unduly splits governmental units in Hamilton, Cuyahoga, and Summit Counties, creating competitive seats in those areas rather than seats where Democrats have an electoral advantage.

## II. ANALYSIS

{¶ 131} The two questions before this court—whether the enacted congressional-district plan "unduly favors or disfavors a political party or its incumbents" or "unduly split[s] governmental units," Article XIX, Section 1(C)(3)(a) and (b), Ohio Constitution—are questions of first impression. Words in the Ohio Constitution mean what they meant to the layperson at the time of enactment. We are to accord Article XIX its original public meaning, free from policy-oriented gloss. *Accord Rutherford v. M'Faddon* (1807) (unpublished), available at https://www.supremecourt.ohio.gov/rod/docs/pdf/0/2001/2001-Ohio-

56.pdf (jury-trial right has the meaning it had "at the time of the framing [of] the constitution").

## A. The applicable standard

{¶ 132} The questions in these cases are the same for both claims: Is it "undu[e]"? Does the enacted congressional-district plan "unduly favor or disfavor"? Does the plan "unduly split"?

{¶ 133} We first discern what we can about the adverb "unduly"—which is an "amorphous" word, *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 985, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (Scalia, J., concurring in the judgment in part and dissenting in part)—and then apply those insights to analyze the alleged partisan favoritism and governmental-unit splits at issue.

{¶ 134} The Constitution does not define "unduly," *see contra* Article XIX, Section 2(C)(1) (defining "split"), so we turn first to the dictionary, *see Centerville v. Knab*, 162 Ohio 623, 2020-Ohio-5219, 166 N.E.3d 1167, ¶ 24. "Undue" means "[e]xcessive or unwarranted," *Black's Law Dictionary* 1838 (11th Ed.2019), "exceeding or violating propriety or fitness," *Webster's Third New International Dictionary* 2491 (2002), and "contrary to justice, right, or law," *id.* (with "archaic" status label). The parties agree on these definitions.

{¶ 135} With these definitions come two basic ideas. Something can be undue simply because it is excessive or too much. Thus, *Webster's* provides the example, " 'his sartorial equipment stops just short of undue elegance.' " *Id.*, quoting Philip Hamburger. But "undue" also connotes the sense of being unwarranted by valid considerations. Thus, when we talk about exercising "undue influence," we don't simply mean that one had too much influence over another; we also mean that there was something improper about the influence. *See West v. Henry*, 173 Ohio St. 498, 501, 184 N.E.2d 200 (1962).

{¶ 136} Under either sense, "undue" is a comparison word. Whether something is undue depends on how much of something is "due" or appropriate. So before we can say whether a plan "unduly" favors a political party, we must have some baseline understanding of what a fair plan that does not favor one political party would look like. As the United States Supreme Court explained in *Rucho v. Common Cause*, "it is only after determining how to define fairness"— that is, determining a baseline—"that you can even begin to answer the determinative question: 'How much is too much?' At what point does permissible partisanship become unconstitutional?" 588 U.S. __, __, 139 S.Ct. 2484, 2501, 204 L.Ed.2d 931 (2019). Only with some understanding of what the baseline is can one answer the question whether favoritism is excessive or exists for an improper reason.

{¶ 137} Indeed, by prohibiting only "undu[e]" favoritism, Section 1(C)(3)(a) presupposes that *some* degree of partisan favoritism and *some* amount of governmental-unit splitting is permissible. Only that which is "undu[e]" is impermissible. *See State ex rel. Carmean v. Hardin Cty. Bd. of Edn.*, 170 Ohio St. 415, 422, 165 N.E.2d 918 (1960) ("It is axiomatic in statutory construction that words are not inserted into an act without some purpose"); *compare* Article XIX, Section 1(C)(3)(a) and (b), Ohio Constitution *with* Article III, Section 20(a), Florida Constitution (proscribing partisan "intent" in redistricting).

{¶ 138} So what is the benchmark against which "unduly" is to be measured? It cannot be whether one party is likely to win more seats than the other in Congress. Imagine, for example, that every precinct in Ohio is a perfect microcosm of the state with each precinct having 54.5 percent of voters who tend to vote for a generic Republican candidate and 45.5 percent for a generic Democratic candidate.[11] In such a scenario, no matter how one draws the districts,

---

11. These figures derive from the measure provided in Article XI, Section 6(B).

in a typical year Republicans could win every last district. But no one could seriously say that the redistricting map "unduly" favored the Republican party.

{¶ 139} The majority thinks that it has a way to fill in this blank spot in the constitutional text. It announces that although the Constitution "does not prohibit a plan from favoring or disfavoring a political party or its incumbents to the degree that inherently results from the application of neutral criteria, * * * it does bar plans that embody partisan favoritism or disfavoritism in excess of that degree—i.e., favoritism not warranted by legitimate, neutral criteria." Majority opinion at ¶ 40. The problem, though, is that this rule still fails to establish a benchmark. Saying "not warranted by legitimate, neutral criteria" cannot be the solution in itself, because there are a lot of ways a plan could comply with "legitimate, neutral criteria." Indeed, no one disputes that the current plan complies with all the neutral criteria in the Constitution (population equality, division of political subdivisions, etc.), as, no doubt, might a good many different plans. So to engage in the majority's exercise, one still needs some idea of the baseline that the favoritism is to be measured against. *See Rucho*, 588 U.S. at __, 139 S.Ct. at 2505, 204 L.Ed.2d 931.

{¶ 140} Though the majority does not plainly state its baseline, its analysis makes clear the baseline that it is using: the results that would be obtained under a system of proportional representation. Popular in Europe, proportional representation is a system of apportionment "designed to represent in a legislative body each political group or party in optimum proportion to its actual voting strength in a community." *Webster's* at 1819. So what the majority is really saying is that a plan unduly favors a political party if it fails to achieve proportional representation for reasons other than the application of neutral redistricting criteria.

{¶ 141} The majority opinion leaves little doubt that a proportional-representation system is its baseline. It begins its application of the standard it has adopted by telling us, "As a starting point, we examine how the two major political parties are expected to perform under the enacted plan." Majority opinion at ¶ 42. It

then supplies an answer: "Dr. Rodden and Dr. Warshaw both found that Republicans are likely to win 80 percent of the congressional seats (12 out of 15) under the enacted plan, even though Republicans have received about 53 percent of the vote in recent statewide elections." *Id.* at ¶ 47. It next looks to testimony from petitioners' experts about metrics that measure the extent to which a plan achieves proportional representation—the "efficiency gap," the "mean-median gap," "declination," and "partisan symmetry"—and uses these proportional-representation metrics to conclude that the plan violates constitutional standards. *Id.* at ¶ 63. The majority wraps up by decrying the plan's failure to meet its proportional-representation standard: a stacked deck "perhaps explains how a party that generally musters no more than 55 percent of the statewide popular vote is positioned to reliably win anywhere from 75 percent to 80 percent of the seats in the Ohio congressional delegation." *Id.* at ¶ 100.

{¶ 142} The problem, though, is that nothing in Article XIX mandates this proportional-representation standard. While Article XI directs the Ohio Redistricting Commission to attempt to draw a General Assembly–district plan in which the statewide proportion of districts that favors each political party "correspond[s] closely to the statewide preferences of the voters of Ohio" based on a proportionality formula, there is no similar language in Article XIX.

{¶ 143} Thus, what the majority does is completely untethered from the text of Article XIX. When it says that the plan unduly favors the Republican Party, what it means is that the plan unduly favors the Republican Party *as compared to the results that would be obtained if we followed a system of proportional representation.*

{¶ 144} So where does that leave us? What the majority does has no relation to the Constitution; the majority simply substitutes its own sense of fairness for the text of Article XIX. That's obviously wrong, but what is the proper course?

{¶ 145} Respondents Cupp and Huffman argue that it is impossible to derive from "unduly favors" any judicially manageable standard and that as a result, we should declare the case to be nonjusticiable. Unwittingly, the majority opinion makes a strong case that they are right. Indeed, the majority offers no principled, judicially manageable standard that can be neutrally applied without respect to the interests of the parties in the case. *See Rucho*, 588 U.S. at __, 139 S.Ct. at 2498, 204 L.Ed.2d 931.

{¶ 146} "[T]he judicial responsibility to avoid standardless decisionmaking is at its apex in ' "the most heated partisan issues." ' " *June Med. Servs., L.L.C. v. Russo*, 591 U.S. __, __, 140 S.Ct. 2103, 2179, 207 L.Ed.2d 566 (2020) (Gorsuch, J., dissenting), quoting *Rucho* at __, 139 S.Ct. at 2499, quoting *Davis v. Bandemer*, 478 U.S. 109, 145, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986). In *Rucho*, after struggling "without success over the past several decades to discern judicially manageable standards for deciding" partisan-gerrymandering claims, the United States Supreme Court held that federal courts would no longer entertain such claims. *Rucho* at __, 139 S.Ct. at 2508. Just recently, our sister court in the Badger State reached a similar conclusion, pronouncing certain gerrymandering claims arising under the Wisconsin Constitution to be nonjusticiable. *Johnson v. Wisconsin Elections Comm.*, 399 Wis.2d 623, 2021 WI 87, __ N.W.2d __, ¶ 80-81. "Claims of political unfairness in the maps present political questions," the court held, "not legal ones." *Id.* at ¶ 4.

{¶ 147} Nonetheless, we are loath to simply declare that this court may never consider a claim that a plan unduly favors a political party or unduly divides political subdivisions. For three reasons, we decline to reach the same nonjusticiability holding as our sister and federal high courts. The first reason is that we need not: as we shall make clear below, even assuming arguendo the justiciability of petitioners' claims, their claims fail under *any reasonable* measure.

**{¶ 148}** Our second reason follows from the Supreme Court's example. *Rucho* was not the first case in its line. It was only after "considerable efforts" over decades and no fewer than one dozen justices' opinions on the topic that the court ultimately deemed the question a political one. *Gill v. Whitford*, __ U.S. __, __, 138 S.Ct. 1916, 1929, 201 L.Ed.2d 313 (2018) (citing cases); *Rucho*, 588 U.S. at __, 139 S.Ct. at 2496-2498, 204 L.Ed.2d 931. This court, by contrast, is asked to adjudicate gerrymandering for the first time. Although the majority comes up short today, we do not rule out that "in another case a standard might emerge," *Vieth v. Jubelirer*, 541 U.S. 267, 312, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (Kennedy, J., concurring).

**{¶ 149}** Lastly, and most fundamentally, the Ohio Constitution provides more guidance than does the United States Constitution. The Ohio Constitution expressly confers on this court "exclusive, original jurisdiction in all cases arising under this article." Article XIX, Section 3(A). Article XIX says that a plan shall neither "unduly favor[ ] or disfavor[ ] a political party" nor "unduly split governmental units," Section 1(C)(3)(a) and (b), and that it is this court's job to identify "legal defects," Section 3(B)(1). "At no point" did the Framers of the federal Constitution "suggest[ ] that the federal courts had a role to play." *Rucho*, 588 U.S. at __, 139 S.Ct. at 2496, citing Hamilton, The Federalist No. 59. Ohio's story is different. The Ohio Constitution assigns this court a role to play in congressional districting.

**{¶ 150}** Although we are not willing to say such claims are never justiciable, we are cognizant that by failing to provide any type of baseline by which the partisan tilt of a plan is to be measured, the Ohio Constitution vests considerable discretion in the political branches. This follows for several reasons. First, Article XIX explicitly vests the primary responsibility for drawing district lines in the General Assembly. *See* Section 1(A) ("Except as otherwise provided in this section, the general assembly shall be responsible for the redistricting of this state

for congress based on the prescribed number of congressional districts apportioned to the state pursuant to Section 2 of Article I of the Constitution of the United States"). Second, our precedent in redistricting cases applies a strong presumption that a plan is constitutional. *Wilson v. Kasich*, 134 Ohio St.3d 221, 2012-Ohio-5367, 981 N.E.2d 814, ¶ 22. Indeed, we have even said that "[i]n the absence of evidence to the contrary, we presume that the [redistricting authority] properly performed its duties in a lawful manner." *Id.* at ¶ 24. Third, the Ohio Constitution entrusts to us only the "judicial power." Article IV, Section 1. The legislative power is reserved to the legislature and to the people through the initiative and the referendum. Article II, Section 1, Ohio Constitution. Only the people have the authority to amend our Constitution. *Id.* at Section 1a. We have no authority to add terms and requirements to Article XIX that the people have not put there.

{¶ 151} With these principles in mind, we now turn to the question whether petitioners have met their burden to show that the congressional-redistricting plan violates Article XIX's requirement that a plan not "unduly favor[ ] or disfavor[ ] a political party," Section 1(C)(3)(a), or "unduly split governmental units," Section 1(C)(3)(b). Petitioners have failed to establish that the plan violates either provision under any standard of review, much less the beyond-a-reasonable-doubt standard that the majority opinion holds is applicable in this case.

## B. Undue partisan favoritism

{¶ 152} By any measure, petitioners have failed to meet their burden to establish a violation of the Constitution's requirement that a plan not unduly favor a political party.

{¶ 153} Begin with a point of agreement by all: of Ohio's 15-seat allotment, six districts will be "solidly Republican" and two will be "solidly Democratic," majority opinion at ¶ 43. The two blue districts encompass Cleveland and Columbus. The six red districts occupy more rural regions of the state. These eight nonnegotiable districts are the result of political geography—Republican voters

disperse more uniformly about the state while Democratic voters cluster in urban centers—and only an extreme gerrymander could alter this arrangement.

{¶ 154} The present dispute involves the seven remaining congressional districts. Accompanying the General Assembly's enacted plan is a statement declaring that the seven districts in question were drawn to be "competitive." Our analysis proceeds as follows: (1) the maximization of competitive districts is a permissible goal under Article XIX, (2) this plan attempts to create competitive districts, (3) the General Assembly's determination of competitiveness was reasonable, and therefore, (4) the plan does not violate Section 1(C)(3)(a) of Article XIX.

*1. It is permissible to draw competitive districts*

{¶ 155} Since the founding, congressional districting has been the province of state legislatures. *See Rucho*, 588 U.S. at __, 139 S.Ct. at 2495-2496, 204 L.Ed.2d 931. Article XIX of the Ohio Constitution provides neutral districting guidelines in Section 2(B) and places additional restrictions on four-year maps in Section 1(C)(3) but is largely discretion-conferring on the legislature (or redistricting commission).

{¶ 156} Generally, those seeking to end partisan gerrymandering have leveled two primary criticisms. First, they claim that partisan gerrymandering unfairly entrenches one political party in power by drawing lines that maximize that party's political representation.

{¶ 157} Second, critics assert that partisan gerrymandering deprives voters of meaningful elections by creating districts with lopsided majorities of voters of one political persuasion or the other. Doing so depresses voter interest and turnout because voters don't feel as if their votes matter. Drawing districts in this manner discourages political compromise and leads to increased polarization. This is because when a district is heavily Democratic or Republican, there is no need from an electoral standpoint for a candidate (or sitting representative) to appeal to the

minority. The most important election is often the primary. *See* Jeffrey S. Sutton, *Who Decides? States As Laboratories of Constitutional Experimentation* 18 (2022) ("If we make nearly 90% of congressional districts safe for one political party or the other, that makes the party primaries nearly the only elections that matter, elections that occur long before the first Tuesday after November 1"). Rather than cater to the median, moderate voter, a candidate (or representative) is incentivized to appeal only to his or her own political base.

{¶ 158} These criticisms suggest two very different objectives that one might have in crafting a redistricting plan. To deal with the first, one could try to create a redistricting map that would ensure something akin to proportional representation. The idea would be to create a map that guarantees representatives who mirror as closely as possible the partisan makeup of the state. This is the objective sought by petitioners in these cases.

{¶ 159} To deal with the second criticism, though, mapmakers would need to create as many closely divided (or competitive) districts as possible. This is the objective that the General Assembly purports to have pursued.

{¶ 160} The rub is that to a large degree, the objectives are mutually exclusive. If mapmakers want to ensure representation that looks like the partisan makeup of the state, then they need to draw districts that are certain to favor one side or the other. But if they want to maximize competitive districts, then they need to draw districts that they aren't sure which side will win. *Rucho*, 588 U.S. at __, 139 S.Ct. at 2500, 204 L.Ed.2d 931.

{¶ 161} In this case, the legislative respondents assert that they sought to maximize competitive districts. The first question we must answer is whether this is permissible under Article XIX. We are convinced that it is.

{¶ 162} We begin with the obvious. In the abstract, congressional districts that are competitive, by definition, do not unduly favor or disfavor a political party. The entire idea behind drawing competitive districts is to afford candidates from

either party legitimate chances of election, to place the political power with the electorate, where it belongs.

{¶ 163} Competitive districts are in some ways the opposite of gerrymandered districts. The prototypical gerrymander involves "packing" certain districts in order to "crack" others. The stratagem is to concede a few districts by maximal margins in order to win more districts by narrower margins. In districts drawn to be competitive, the winner won't be known until the polls are closed and the votes tallied. This is democracy as we know it. Competitive districts are widely considered a laudable objective, the sort of objective voters desire; they do not unduly favor or disfavor political parties but allow the electorate to elect.

{¶ 164} That is not to say that the text of Article XIX mandates that mapmakers maximize competitive districts. Indeed, unlike Article XI, Section 6(B), nothing in Article XIX prescribes the General Assembly's goal in drawing congressional maps. The Article XIX provisions at issue impose negative restraints—what not to do. That leaves map-drawers tremendous leeway to target various goals in executing that function.

{¶ 165} Petitioners' experts have introduced statistical measures designed to approximate one concept of fairness. They all use as their baseline the idea that a plan is fair when it achieves a result that resembles proportional representation. One such measure is the "efficiency gap"—the comparative measure of wasted votes, votes cast toward a losing candidate or unnecessarily toward a winning candidate. *See* majority opinion at ¶ 63. In a perfectly efficient map, there would be no wasted votes and proportional representation would be achieved—a party's representation in Congress would exactly match its percentage of the statewide vote. Another measure used by petitioners' experts is partisan symmetry, an explicit measure of proportional representation that compares a party's statewide vote share to the percentage of districts it holds. We are also told about the "mean-median gap" and "declination," other measures that are similarly based on a

proportional-representation ideal. *See id.* at ¶ 63 (defining the measures). Had the General Assembly sought to optimize any or several of these measures, we have little doubt that such a plan would satisfy constitutional standards. And so too would a plan that sought to maximize proportionally representative congressional districts.

{¶ 166} But there is nothing in the Ohio Constitution that mandates any of these things as a goal. And there is nothing in the Constitution that precludes mapmakers from seeking to maximize competitive districts. Thus, we conclude that the General Assembly did not violate the Constitution by prioritizing the creation of competitive districts over other objectives, such as achieving proportional representation.

### 2. *The General Assembly pursued competitive districts*

{¶ 167} The General Assembly found that the plan contains "seven competitive districts." 2021 Sub.S.B. No. 258, Section 3. When the governor signed the bill, he stated: "With seven competitive congressional districts in the SB 258 map, this map significantly increases the number of competitive districts versus the [2011] map." Governor of Ohio News Releases, *Governor DeWine Signs Senate Bill 258*, https://governor.ohio.gov/wps/portal/gov/governor/media/news-and-media/governor-dewine-signs-senate-bill-258-11222021 (accessed Jan. 12, 2022) [https://perma.cc/7QFL-ZSYY]. A majority of both houses of the legislature joined by the state's chief executive officer thus agree that the seven districts in question are competitive.

{¶ 168} The majority asserts that "competitiveness was offered here as a post hoc rationalization." Majority opinion at ¶ 45. But nothing in the record backs that up. Before drawing up the plan, Senate President Huffman and Senators Rob McColley, Vernon Sykes, and others heard public testimony regarding congressional redistricting. Among the topics debated was defining "competitive." During that debate, a representative of Fair Districts Ohio said: "[T]here are going

to be tradeoffs. But just because there's a creation of a few more competitive districts, that doesn't mean that those districts aren't compact, don't keep counties together." Later, Senator Sykes asked another citizen what in terms of percentages he "consider[ed] to be competitive." House Speaker Cupp expressed concern that championing competitive districts might lead to increased polarization within districts.

{¶ 169} The person primarily responsible for drawing the eventually enacted map, Raymond DiRossi, stated in a deposition: "[T]here was a tremendous amount of public testimony about the existence of competitive districts and what type of range would be used to determine what was a competitive district. And I know [Senator McColley] had put a lot of thought into that." Later he explained, "[T]hat's the point, that we're trying to draw competitive districts now; whereas, the [2011] map doesn't have them."

{¶ 170} All of this goes to demonstrate that competitive districts were front of mind for the General Assembly before and during the map-drawing process. The majority may prefer a different objective—namely, proportional representation— but competition within districts is the valid interest respondents have always asserted to justify the enacted plan.

### 3. The determination of competitiveness was reasonable

{¶ 171} Still there remains a question of fact whether the seven districts under review *actually* are competitive. The majority opinion correctly observes that Article XIX does not "prescribe[ ]" competitiveness, nor define it, and we are "forbid[den]" from "adding to the text." Majority opinion at ¶ 45. Because we agree with the majority that "Article XIX itself does not * * * provide any calculable measure for it," *id.*, competitiveness is not this court's measure to define.

{¶ 172} We are guided by a " 'universally recognized principle' " by which this court has long abided:

> "[A] court has nothing to do with the policy or wisdom of a statute. That is the exclusive concern of the legislative branch of the government. When the validity of a statute is challenged on constitutional grounds, the sole function of the court is to determine whether it transcends the limits of legislative power."

*Brady v. Safety-Kleen Corp.*, 61 Ohio St.3d 624, 632, 576 N.E.2d 722 (1991) (plurality opinion), quoting *State ex rel. Bishop v. Mt. Orab Village School Dist. Bd. of Edn.*, 139 Ohio St. 427, 438, 40 N.E.2d 913 (1942). Just as with congressional redistricting, the General Assembly is "entrusted with making complicated decisions about our state's educational policy," *State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, ¶ 73. In that realm we have said, "[P]olicy decisions are within the purview of [the General Assembly's] legislative responsibilities, and that legislation is entitled to deference." *Id.* That principle of deference to legislative prerogatives must apply with equal force to the congressional-district plan before us today.

{¶ 173} The General Assembly chose to define a competitive district as one within 4 percent of a coin flip. A district with a projected 53-47 partisan split, in either direction, is considered competitive. A 55-45 split is not. Senator McColley and Senate President Huffman, the lead sponsors of the districting plan, arrived at this number after taking considerable public testimony. What's important for judicial-review purposes, though, is that plus or minus 4 percent is the range that the General Assembly as a legislative body countenanced by enacting this map "in the form of a bill," Article XIX, Section 1(C)(1), Ohio Constitution.

{¶ 174} In determining the partisan propensity of a district, the drafters of the enacted plan relied upon a data set ("the FEDEA index") comprised of all the statewide federal elections that occurred in the last decade: the 2012, 2016, and

2020 presidential elections and the 2012, 2016, and 2018 senatorial contests. The plan also took measures to, when feasible, avoid splitting counties and placing two incumbents in the same district ("double bunking").

{¶ 175} The result was a congressional-district plan with seven—the maximum—competitive districts, by the General Assembly's definition, with 14 total county splits and one doubly bunked district that contains two incumbents.[12] To be thorough, the seven FEDEA competitive districts are District 1 (51.5-48.5%), District 6 (52.9-47.1%), District 9 (47.7-52.3%), District 10 (52.2-47.8%), District 13 (48.6-51.4%), District 14 (53.2-46.8%), and District 15 (53.7-46.3%). Of the seven competitive districts, two are plus or minus 2 percent, five are plus or minus 3 percent, and all are plus or minus 3.75 percent. And Democratic candidates have fared well recently in these seven competitive districts. Out of the six statewide federal elections since 2012, a Democratic candidate has won in each district, in some districts securing more than 59 percent of the vote. Competitive indeed.

{¶ 176} For reference, the other plans presented to the legislature included fewer competitive districts. The House and Senate minority party offered separate plans, each with just five competitive districts.

{¶ 177} Petitioners respond that plus or minus 4 percent is an arbitrary measure of competitiveness and that FEDEA is not the best index. On the first score, of course the measure (like any such measure) contains a degree of arbitrariness. That is precisely why judicial intervention is unwarranted. The General Assembly, this state's policymaking body, chose that range. We have no authority or competence to monitor the dividing line between competitive and not. Would a plus-or-minus-3-percent boundary have produced more competition? Of course. Does the Constitution mandate that? Of course not.

---

12. Two congressmen currently live in the new District 1, but Congressman Brad Wenstrup has announced that he will contend for the District 2 seat. No Democratic congressmen were double bunked.

{¶ 178} The General Assembly purported to draw seven competitive districts and defined competitive as within 4 percent of 50/50. All that we as judges can say is that based on the record before us, using plus or minus 4 percent as the determinative measure was not unreasonable. Had the General Assembly chosen an inflated number, say plus or minus 15 percent, then we could fairly intervene to call it unreasonable as a matter of law to define as "competitive" a projected 65-35-percent district. We must remember that the FEDEA index supplies ex ante *projections*, not ex post results. The index does not take into account the relative political experience and ability of the candidates running vis-à-vis the past elections, changes to national and statewide circumstances and attitude, party platform, control over the White House, and dozens of additional factors—all the way down to gas prices—that can sway a given election regardless of what the data predict. To this point, one expert reports that "in the 2020 congressional election, the actual results in Ohio's sixteen congressional districts varied, on average, by 5.8 percentage points from the average of the 2011-2020 partisan index," including variances upwards of 15 percentage points. Exhibit No. 36, Expert Report of Dr. Michael Barber at 18.

{¶ 179} And lawmakers routinely make line-drawing decisions akin to the plus-or-minus-4-percent line. Think budgetary decisions. The General Assembly allocates funds. Is the decision to allocate $1 million instead of $1.2 million "arbitrary" in one sense of the word? Yes. But is it arbitrary in the judicial-review sense—i.e., arbitrary and capricious as a matter of law? Again, of course not. Or think speed limits. Why 35 miles per hour and not 30? Why is 270 days the statutory limit to conduct a speedy felony trial? *See* R.C. 2945.71(C)(2). Why not 250 days? The point is this: drawing policy-oriented lines is at the heart of the legislative power. *Vieth*, 541 U.S. at 291, 124 S.Ct. 1769, 158 L.Ed.2d 546. Save for unreasonableness, the judiciary is to steer clear.

{¶ 180} The majority and petitioners do not contend, and experts have not reported, that 4 percent is too wide a margin to qualify as competitive. Suffice it to say that defining "competitive" as within 4 percent of dead even is not unreasonable as a matter of law.

{¶ 181} Then comes the refrain that the FEDEA index is flawed, that other indices provided a more accurate account of where voter sentiments lie. The chief complaint seems to be that by using only federal elections, the index omits the statewide elections that occurred in 2014. But we are hard-pressed as judges to say that the legislature was wrong in choosing to use federal-election data to predict voter tendencies in federal elections. Indeed, one might reasonably argue that including 2014 state-election data would skew the data set. After all, that year it was revealed that the Democratic gubernatorial candidate did not have an Ohio driver's license,[13] leading to an election in which he received only 33 percent of the vote.[14] The down-ballot races followed suit with the Democratic candidates for attorney general, secretary of state, treasurer, and auditor receiving 38.5, 35.5, 43.4, and 38.3 percent, respectively. 2014 Elections Results, https://www.ohiosos.gov/elections/election-results-and-data/2014-elections-results/?__cf_chl_jschl_tk__=5BNyaJhQ5eJBu.i7qqj_uZJzFJrSNgYduJ.hClWxz vA-1641919620-0-gaNycGzNCP0 (accessed Jan. 12, 2022).

{¶ 182} Importantly, in contrast to Article XI, which tells the redistricting commission exactly what type of election data to use in drawing a General Assembly-district plan, *see* Article XI, Sections 6(B) and 9(D)(3)(c)(i), Ohio Constitution, the congressional-redistricting amendment, Article XIX, is silent on

---

13. *See* https://www.toledoblade.com/State/2014/08/06/Ohio-candidate-lacked-driver-s-license-for-decade.html (accessed Jan. 12, 2022) [https://perma.cc/S7HM-YWVW].

14. *See* https://www.ohiosos.gov/elections/election-results-and-data/2014-elections-results/?__cf_chl_jschl_tk__=5BNyaJhQ5eJBu.i7qqj_uZJzFJrSNgYduJ.hClWxzvA-1641919620-0-gaNycGzNCP0 (accessed Jan. 12, 2022).

that issue. The point is not that we need to resolve the debate about whose data set is better but, rather, that this is exactly the kind of question that is entrusted to the General Assembly, not to the courts.

{¶ 183} Drs. Christopher Warshaw, Kosuke Imai, and Jowei Chen all say that the plan could have been even more competitive. No doubt this is true. But bring in any group of expert economists, and they will tell you that the tax code is suboptimal. Environmental scientists will report that the pollution laws are inadequate. And criminologists will demonstrate that the sentencing laws do not minimize recidivism.

{¶ 184} Legislating is—and was designed to be—an act of give-and-take, compromise. *See* Hamilton, The Federalist No. 85. The question we must answer is not whether the plan is *optimally* competitive. It is whether the plan is *sufficiently* competitive to avoid violating the Constitution's prohibition of undue favoritism. And we are guided by the principles of legislative deference this court has long honored in policy-oriented matters.

{¶ 185} The General Assembly determined that the FEDEA data comprise an appropriate index of district competitiveness. And it gave its reasons. The FEDEA index (which, recall, factors in recent statewide elections to federal office) was used because the plan is for a *federal* election. The General Assembly chose a data set that is smaller but, in its determination, more precise than others available. Electoral data including statewide elections to state offices risked incorporating inputs irrelevant to federal elections: purely local voter motivations. Presidents and senators face the same issues with which U.S. representatives must grapple, but that is not the case for governors and state auditors.

{¶ 186} We cannot say that the General Assembly acted unreasonably by enacting a plan based on the FEDEA index. The Constitution does not prohibit the legislature from making the determination that it made. That leaves us no reason

to quibble with the legislature's determination that the plan creates seven competitive districts.

### 4. The majority's flawed analysis

{¶ 187} Our deferential approach looks nothing like the majority's. This is because the majority undertakes the legislative act of evaluating the plan from a policy-oriented perspective, not a legal one. The majority's approach is undergirded by an "instinct" that proportionality is the essence of fairness, *Rucho*, 588 U.S. at __, 139 S.Ct. at 2499, 204 L.Ed.2d 931. But, as we have explained, nothing within Article XIX mandates proportional representation as a standard against which a plan should be measured. To the contrary, proportional representation is a " 'norm that does not exist' in our electoral system" generally, *id.*, quoting *Davis v. Bandemer*, 478 U.S. 109, 159, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) (O'Connor, J., concurring), or in Article XIX specifically. In assuming that proportional representation is the ideal, the majority ignores the fact that such a norm "comes at the expense of competitive districts and of individuals in districts allocated to the opposing party," *id*. at __, 139 S.Ct. at 2500. The General Assembly and respondents never proclaimed to have sought proportionality; they pursued the alternative but equally permissible goal of competitive districts.

{¶ 188} The majority concludes that the plan favors the Republican Party unduly—to a degree "exceeding what is warranted by Article XIX's line-drawing requirements and Ohio's political geography," majority opinion at ¶ 41—by looking across an array of measures: expected performance, treatment of selected counties, and statistical measures of partisanship. We are not told which one of these considerations is conclusive but are told to trust that taken altogether, the map is unconstitutional.

{¶ 189} As far as the plan's expected performance, the majority highlights expert reports submitted by petitioners that it claims show that "the enacted plan is not nearly as competitive as Senate President Huffman and House Speaker Cupp

claim that it is." *Id*. at ¶ 46. It cites reports of three of petitioners' experts that predict that Republicans will win 12 seats under the plan and another report predicting that Republicans will win 11 seats. Some experts factored in an "incumbency advantage" in their predictions. (One has to wonder about the logic that says a district should not be characterized as "competitive" because it contains an incumbent who is popular with voters in a district.) Two of the experts cited by the majority prepared simulated maps that they contend show that the enacted plan is a statistical outlier favoring Republicans. None of these maps, however, have been submitted as part of the record, so we are little able to evaluate them. Another flaw, most of these experts used election results from statewide elections instead of the FEDEA data set relied on by the legislature.

**{¶ 190}** The majority leans heavily on the expert report of the Harvard statistician Dr. Imai, for his report is based on the FEDEA index. But Dr. Imai's report suffers a more fundamental defect. His hypothetical districts were not equipopulous. In generating 5,000 simulated maps based on FEDEA data, Dr. Imai allowed for up to "0.5% deviation from population parity," or roughly a 4,000-person variance. Expert Report of Kosuke Imai, Ph.D. In accordance with Article XIX, Section 2(A)(2), however, the General Assembly constructed districts varying by no more than one person—that's a 0.00013% deviation, one ten-thousandth of a percentage point. Achieving absolute population equality in congressional districts is, after all, a "paramount objective of apportionment." *Karcher v. Daggett*, 462 U.S. 725, 732-733, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983). To compare Dr. Imai's maps to the enacted plan (as is central to the majority's analysis) is rather like comparing watermelons to walnuts.

**{¶ 191}** Abruptly, the majority transitions from summarizing the expert evidence to announcing that it "conclude[s] that the body of petitioners' various expert evidence significantly outweighs the evidence offered by respondents as to both sufficiency and credibility, compelling beyond any reasonable doubt the

conclusion that the enacted plan excessively and unwarrantedly favors the Republican Party and disfavors the Democratic Party." Majority opinion at ¶ 51. This is not legal analysis; it is cherry-picking evidence from an expansive record to meet policy preferences, crediting it, and regurgitating the language of a generic holding based on an illegitimate legal standard. More is required.

{¶ 192} Indeed, the majority's focus on expected performance underscores that it is simply assessing the plan for how closely it comes to achieving proportional representation. The expert reports pertaining to expected performance are couched as "conclusions" but are better described as *informed predictions*. The unspoken reality is that the majority clings to expected-performance reports because they predict that statewide votes per party may not perfectly correlate with seats elected per party. But the Constitution does not require such a correlation. The majority also fails to account for the fact that political geography dictates the outcome of eight out of 15 districts. Moreover, because the seven remaining districts are competitive, there is no guarantee that even the predictions of experts will turn out to be accurate.

{¶ 193} With respect to competitiveness, these extrapolations at most establish that the districts could have been more competitive. Nowhere do the reports establish that the enacted districts are uncompetitive. To do so would require evidence that a 4 percent variance is too wide or the FEDEA data too misleading. Even Dr. Imai's flawed report, in which the majority is so heavily leveraged, does not refute that seven districts are competitive; it simply suggests that Republican candidates may win a number of these competitive districts.

{¶ 194} Next, the majority states that the splits of Cuyahoga, Franklin, and Hamilton Counties unduly favor the Republican party. Dr. Imai reports that in Hamilton County, the Democratic vote share is cracked across three districts. Drs. Chen and Rodden explain that these splits are not necessary. The question, however, is whether they are *permissible*. The majority's primary complaint is that

71

the strongly Democratic city of Cincinnati is in a district that contains the entirety of Warren County. But there is a perfectly valid justification for this: the Ohio Constitution requires an "attempt to include at least one whole county in each congressional district." Article XIX, Section 2(B)(8).

{¶ 195} Maybe the predictions made by petitioners' experts will turn out to be correct and the incumbent Republican congressman will win reelection in District 1. The question, however, is whether the party is favored *unduly*. The answer is obviously no: District 1 is "hyper" competitive, with the FEDEA data showing a slight 51.5 to 48.5 percent Republican advantage. Indeed, President Biden won District 1 by 0.9 percent in 2020. District 1 is up for the taking.

{¶ 196} Dr. Rodden also claims, as the majority puts it, that the plan "carves up the Black community in Cincinnati." Majority opinion at ¶ 56. Petitioners have not, however, asserted a racial-gerrymandering claim under the framework required by *Shaw v. Reno*, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).

{¶ 197} As we consider in detail below, the majority makes similar arguments regarding the splits of Cuyahoga and Franklin Counties. In the end, the General Assembly explained why it split the counties the way it did: to make seven districts competitive. The majority seems to prefer proportional representation over competitive districts, but proportionality is not prescribed in Article XIX.

{¶ 198} Finally, and as stated above, statistical measures like efficiency gap, mean-median gap, declination, partisan symmetry, and others are perfectly informative data measures. They tell a useful story about how closely an enacted plan achieves an ideal of proportional representation. But they are not in the Constitution. The General Assembly had no obligation, only the option, to use these fancy metrics. It chose, instead, to pursue competitive districts, which was its prerogative.

{¶ 199} Summing all this up: competitive districts do not unduly favor or disfavor a political party. The General Assembly enacted a plan with what it

considers to be seven competitive districts. Its definition of competitive (plus or minus 4 percent) is not unreasonable. Neither is the data it used to calculate variance (FEDEA). We have no basis to pronounce that the enacted plan "transcends the limits of legislative power," *Bishop*, 139 Ohio St. at 438, 40 N.E.2d 913. Despite everything the majority says today, petitioners have not established that the congressional-district plan unduly favors or disfavors a political party in contravention of Article XIX, Section 1(C)(3)(a).[15] The General Assembly, therefore, is entitled to the last word on this quintessential policy matter.

## C. Undue division of governmental units

{¶ 200} Article XIX, Section 1(C)(3)(b) prohibits the General Assembly from unduly splitting governmental units when it enacts a congressional-district plan by a simple majority vote. That provision states:

> If the general assembly passes a congressional district plan under division (C)(1) of this section by a simple majority of the members of each house of the general assembly, and not by the vote described in division (C)(2) of this section [i.e., three-fifths majority with at least one-third of the members of each of the two largest political parties in the house], all of the following apply:
>
> * * *
>
> (b) The general assembly shall not unduly split governmental units, giving preference to keeping whole, in the order named, counties, then townships and municipal corporations.

Section 1(C)(3).

---

15. The majority does not address the treatment of incumbents, so neither do we.

{¶ 201} The majority's reasoning that the congressional-district plan adopted by the General Assembly unduly splits counties is flawed for several reasons: first, it relies on evidence of partisan favoritism and lack of compactness even though those are the subject of other provisions; second, it looks at county splits in isolation without considering them in the context of the division of other governmental units (townships and municipalities); third, it disregards Section 2(B)(5), which allows the General Assembly to split five counties more than once; fourth, it ignores evidence that the congressional-district plan does not unduly split governmental units; and lastly, the plan's division of Hamilton, Summit, Franklin, and Cuyahoga Counties is supported by the neutral map-making criteria of Section 2.

{¶ 202} Article XIX, Section 1(C)(3) imposes three limits on a congressional-district plan that is not passed by a sufficiently bipartisan vote. Such a plan may not (1) "unduly favor[ ] or disfavor a political party or its incumbents," Section 1(C)(3)(a), or (2) "unduly split[ ] governmental units," Section 1(C)(3)(b), and (3) the General Assembly must attempt to draw compact districts, Section 1(C)(3)(a). The majority, however, conflates these three limitations by concluding that a plan unduly splits governmental units if the line drawing appears to give undue partisan advantage and to result in noncompact districts. But undue partisan advantage and lack of compactness cannot be the measure of whether governmental units have been unduly split, because it would render the separate limitations imposed by Section 1(C)(3) redundant. "[E]ffect should be given to every part of the instrument as amended, and in the absence of a clear reason to the contrary no portion of a written Constitution should be regarded as superfluous." *Steele, Hopkins & Meredith Co. v. Miller*, 92 Ohio St. 115, 120, 110 N.E. 648 (1915).

{¶ 203} The majority's analysis also fails to give effect to Article XIX, Section 2(B)(5). That provision states that "[o]f the eighty-eight counties in this state, sixty-five counties shall be contained entirely within a district, eighteen

counties may be split not more than once, and five counties may be split not more than twice. The authority drawing the districts may determine which counties may be split." Not only does the plain language of Section 2(B)(5) vest the General Assembly with express authority to determine which counties should be split, but it also tells the legislature how many counties it may split once or twice.

{¶ 204} The majority claims that county splits may be undue under Section 1(C)(3)(b) even if they fall within the express authority to divide up to five counties twice as granted by Section 2(B)(5). But this analysis is flawed. First, the majority improperly again reads Section 1(C)(3)(a)'s prohibition on undue partisanship into Section 1(C)(3)(b), stating that Section 1(C)(3)(b) prohibits county splits that "confer a partisan advantage on the party drawing the plan," majority opinion at ¶ 60. That is, under the majority's reasoning, Section 1(C)(3)(b) means that "[t]he general assembly shall not unduly split governmental units *by unduly favoring or disfavoring a political party or its incumbents*, giving preference to keeping whole, in the order named, counties, then townships and municipal corporations." We lack the power to add this italicized language to the Constitution under the guise of judicial interpretation. *See Braddock v. Pub. Util. Comm.*, 137 Ohio St. 59, 65, 27 N.E.2d 1016 (1940). Rather, the authority to amend the Ohio Constitution is reserved to the people of this state under Article XVI, Section 1.

{¶ 205} Second, in purporting to harmonize Sections 1(C)(3)(b) and 2(B)(5) of Article XIX, the majority fails to appreciate that these provisions are worded differently. Section 1(C)(3)(b) prohibits the undue division of *governmental units*; a county is only one type of governmental unit. Section 1(C)(3)(b) also applies to municipal corporations and townships. Section 2(B)(5), on the other hand, specifically addresses the division of *counties*. Different words, of course, signal a different meaning. *See Obetz v. McClain*, 164 Ohio St.3d 529, 2021-Ohio-1706, 173 N.E.3d 1200, ¶ 21. And in the event of a conflict, a more specific provision like Section 2(B)(5) controls over a more general provision like

Section 1(C)(3)(b). *See State ex rel. Maxcy v. Saferin*, 155 Ohio St.3d 496, 2018-Ohio-4035, 122 N.E.3d 1165, ¶ 10. For this reason alone, because the plan divides fewer than five counties twice, it cannot violate Section 1(C)(3)(b)'s prohibition on unduly splitting governmental units.

{¶ 206} Section 1(C)(3)(b) focuses on whether a congressional-district plan unduly splits governmental units—counties, municipalities, and townships. It is therefore not possible to look at individual county splits in a vacuum, as the majority does. This provision does not say that the General Assembly shall not unduly divide any individual county, municipality, or township, but rather, it provides that "[t]he general assembly shall not unduly split governmental units," with units expressed in the plural. That means we have to consider the division of governmental units in the context of the statewide plan as a whole to determine whether the splits are undue, and counties are only one part of the analysis. Yet the majority examines only 4 of the 12 county splits, and the division of townships and municipalities does not factor into its analysis at all. How can the majority reasonably decide that the congressional-district plan "unduly splits governmental units," Section 1(C)(3)(b), without considering all the governmental-unit splits made in that plan? Plainly, it cannot.

{¶ 207} Consider for a moment that the enacted plan contains 14 splits in relation to counties. (Twelve counties are split, with two of those being split twice.) Now consider that there are 15 districts in the state. In order to have 15 districts that are evenly populated (i.e., with 786,629 or 786,630 people), one must split at least 14 counties. That is because there is no way to group whole contiguous counties and end up with even one district that adds up to exactly 786,629 or 786,630. Each district must contain a divided county. Because one county can be divided into two districts, the minimum possible number of splits is 14 (the total number of districts minus one). Think of it this way: a train composed of 15 cars requires 14 connectors. County splits are the "connectors" that allow for equal

population. Expert testimony confirms that 14 is the minimum possible number. Therefore, the enacted plan contains the minimum possible number of county splits. So when the majority finds that the plan unduly divides counties, what it is actually saying is that the plan divides the wrong counties. Nowhere, though, does the majority propose what counties should be divided instead of the ones the legislature chose.

{¶ 208} One of petitioners' experts, Dr. Jonathan Rodden, a professor of political science at Stanford University, compared the governmental-unit splits in the enacted congressional-district plan to the plans presented by House Democrats, Senate Democrats, and the Ohio Citizens' Redistricting Commission ("OCRC"). The enacted plan contains 14 splits with respect to counties (including Hamilton and Cuyahoga Counties being split twice). Although the other three plans did not contain any counties split more than once, they nonetheless had a similar total number of county splits. The plans Dr. Rodden reviewed also had similar divisions of townships and municipalities: the enacted plan divided 8 townships and 9 cities (17 splits); the Senate Democrats' plan divided no townships and 15 cities (15 splits); the House Democrats' plan divided 13 townships and 6 cities (19 splits); and the OCRC's plan divided 26 townships and 1 city (27 splits). (Raymond DiRossi averred that the House Democrats' plan in fact contained 20 splits.) Petitioners' own expert, Dr. Rodden, even opined that the General Assembly "clearly placed considerable effort into minimizing these splits."

{¶ 209} Petitioners' expert Dr. Jowei Chen, an associate professor of political science at the University of Michigan, explained that "an entire plan of 15 congressional districts requires only 14 county splits." And in the 1,000 simulated plans he prepared, the number of township and city splits ranged from 13 to 19, with most simulated plans containing 14 to 16 divisions. His report also stated that "the Enacted Plan certainly does not create an excessively large number of total county splits statewide." (Emphasis deleted.)

{¶ 210} Dr. Imai prepared 5,000 simulated congressional-district plans that he asserts complied fully with Article XIX. And of those simulated plans, none of them split counties once more than nine times, split counties twice more than once, or split more than nine counties in total. But as explained above, Dr. Imai is comparing watermelons and walnuts—unlike the enacted plan, his plans did not create equally populated districts. His report states that "the total number of counties split under the enacted plan is much greater than that under any of the simulated plans." Of course it is: if one doesn't require that every district have the same population, fewer county splits are necessary. Furthermore, Dr. Imai does not provide a valid opinion regarding whether the adopted congressional-district plan unduly divides governmental units by considering only county splits without also looking at the divisions of townships and municipalities as well. Moreover, petitioners failed to submit Dr. Imai's maps into evidence. For all his report shows, the 5,000 simulated plans may have minimized the division of counties at the expense of unduly splitting other governmental units. His opinion in this regard, then, carries little weight.

{¶ 211} Petitioners' evidence, then, does not support their claim that the General Assembly unduly split governmental units.

{¶ 212} But even if this court could consider only county splits in gauging the congressional-district plan's compliance with Section 1(C)(3)(b), the majority's analysis is nonetheless unpersuasive.

{¶ 213} To start, the majority states that "[t]he enacted plan splits Hamilton County into three districts for no apparent reason other than to confer an undue partisan advantage on the Republican party." Majority opinion at ¶ 84. However, that statement fails to acknowledge that the General Assembly had to contend with other mandatory provisions of Article XIX in exercising the discretion conferred by Section 2(B)(5) to decide which counties to split. Most prominently, Hamilton County's population (830,639 as of the most recent federal decennial census) is too

large to be contained in a single district, so it had to be divided at least once. At the same time, though, Cincinnati's population of 309,317 meant that Section 2(B)(4)(b) prohibited the General Assembly from splitting the city into separate districts. In addition, Article XIX, Section 2(B)(8) required the General Assembly to "attempt to include at least one whole county in each congressional district." The General Assembly complied with these mandatory provisions by placing all of Cincinnati in a district that included all of Warren County, and the majority points to no evidence showing that it was possible to split Hamilton County only once while also keeping Cincinnati intact and attempting to have a whole county within that congressional district.

{¶ 214} A similar analysis applies to Summit County. With a population of 540,428 as of the 2020 federal decennial census, Summit County was not populated enough to make up its own district. And because Akron has a population greater than 100,000, Section 2(B)(4)(b) prohibited the General Assembly from splitting the city into separate districts. The congressional-district plan keeps Akron intact while placing it with all of Medina County, allowing the General Assembly to comply with Section 2(B)(8)'s requirement to attempt to have a whole county in each district.

{¶ 215} Other requirements limited the General Assembly's choices of how to draw districts containing Columbus and Cleveland. Based on their respective populations of 1,323,807 and 1,264,817, Franklin County and Cuyahoga County were too populous to occupy only one district and therefore had to be divided at least once. At the same time, Columbus had too great a population to be placed undivided into a single district. Further, Section 2(B)(4)(a) required the General Assembly to "attempt to include a significant portion" of the city of Columbus in a single district, and Section 2(B)(4)(b) prohibited the General Assembly from splitting Cleveland into separate districts. The General Assembly complied with these provisions. Further, the decision to split Cleveland into three districts is

supported by Section 2(B)(7), which expressly permits congressional districts to share portions of the territory of more than one county when the county's population exceeds 400,000.

{¶ 216} For these reasons, it is manifest that the General Assembly's congressional-district plan does not unduly divide governmental units and that it complies with Section 2(B)(5) by splitting fewer than five counties twice. That the General Assembly could have made other choices does not make the statewide division of governmental units excessive or unreasonable, and consideration of partisan fairness and compactness are irrelevant to this analysis. The plan splits the bare minimum number of counties. The number of divisions is comparable to other plans presented to the General Assembly as well as to Dr. Chen's 1,000 simulated plans. Further, the majority's focus on only 4 counties out of 88 (not to mention all the townships and municipal corporations it does not consider) shows that the number of divisions of governmental units was neither excessive nor unreasonable. Consequently, the enacted plan does not violate Article XIX, Section 1(C)(3)(b).

### D. Remedy

{¶ 217} The majority offers barely a word about the remedy for its discovered constitutional violation other than to say that the entire enacted plan is invalid. Here is what the Constitution dictates must happen next: the General Assembly "shall remedy any legal defects in the previous plan identified by the court." Article XIX, Section 3(B)(1). But critically, the new plan "shall include no changes to the previous plan other than those made in order to remedy those defects." Section 3(B)(1). That is, the new plan must look *exactly like* the enacted plan, save for the adjustments to specific "legal defects * * * identified by the court."

{¶ 218} We don't envy the legislature's task here. Despite ordaining that the entire map is unconstitutional, the majority has provided little guidance that will

assist the legislature in remedying the majority's perceived defects. We simply note the limited leeway that the Constitution affords map-drawers on remand.

## III. CONCLUSION

{¶ 219} Because we cannot say that the General Assembly's congressional-district plan unduly favors a political party or unduly splits governmental units, we must respectfully dissent. The majority reaches a contrary result by employing a proportional-representation measuring stick that springs not from Article XIX but from its own policy preferences. In doing so, it treads far beyond the power that it is afforded by the Ohio Constitution.

———————————

McTigue & Colombo, L.L.C., Donald J. McTigue, and Derek S. Clinger; and Elias Law Group, L.L.P., Abha Khanna, Ben Stafford, Aria C. Branch, Jyoti Jasrasaria, Spencer W. Klein, and Harleen K. Gambhir, for petitioners in case No. 2021-1428.

ACLU of Ohio Foundation, Inc., Freda J. Levenson, and David J. Carey; American Civil Liberties Union, and Julie A. Ebenstein; and Covington & Burling, L.L.P., Robert D. Fram, Donald Brown, David Denuyl, Joshua González, Juliana Goldrosen, James Smith, L. Brady Bender, Alex Thomson, Anupam Sharma, and Yale Fu, for petitioners in case No. 2021-1449.

Dave Yost, Attorney General, and Bridget C. Coontz, Michael A. Walton, and Julie M. Pfeiffer, Assistant Attorneys General, for respondent Ohio Secretary of State Frank LaRose.

Nelson Mullins Riley & Scarborough, L.L.P., Phillip J. Strach, Thomas A. Farr, John E. Branch III, and Alyssa M. Riggins; and Taft Stettinius & Hollister, L.L.P., W. Stuart Dornette, Beth A. Bryan, and Philip D. Williamson, for respondents Senate President Matt Huffman and Speaker of the House Robert Cupp.

Chris Tavenor, urging granting of relief for amicus curiae, Ohio Environmental Council.

_____